U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

JUN 1 5 2017

LAWRENCE K. BAERMAN, CLERK
ALBANY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
ANTHONITTE CARRANZA,

                                        *Plaintiff,*

*v.*

GUARANTEED RATE, INC. and VICTOR
CIARDELLI,

                                        *Defendants.*

QUI TAM COMPLAINT
AND
DEMAND FOR A JURY TRIAL

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §§ 3729 *et seq.*

Civil Action No.

1:17-CV-637
MAD/DJS

1.      Relator  Anthonitte Carranza ("Relator") brings this qui tam action in the

name of the United States of America, by and through her undersigned attorneys Thomas &

Solomon LLP, and alleges as follows:

## INTRODUCTION

2.      This is a civil fraud action by qui tam Relator on behalf of the United States

("the Government"), against Guaranteed Rate, Inc. and Victor Ciardelli (collectively

"Guaranteed Rate" or "Defendants") to recover treble damages and civil penalties under the

False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, for damages sustained by the United

States Department of Housing and Urban Development ("HUD"), the Federal Housing

Administration ("FHA"), and the United States Department of Veteran Affairs ("VA") in

connection with Guaranteed Rate's origination, underwriting, and quality control of FHA

and VA loans (collectively "government loans") under the FHA and VA programs

(individually and collectively, the "Government Programs").

3.      The FCA provides that a person is liable to the United States Government for

each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

4.     Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.

5.     Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

6.     The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

7.     The FHA promotes American homeownership through its Direct Endorsement ("DE") Lender Program or "DE Program."

8.     FHA is a part of HUD and is one of the largest mortgage insurers in the world.

9.     Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured millions of home loans since FHA's inception.

10.     Similarly, the VA promotes home ownership for veterans, active duty personnel, certain surviving spouses, and reservists through the VA Home Loan Guaranty Program ("VA Program").

11.     Under the VA Home Loan Guaranty Program, the VA provides a guarantee of up to 50% of the loan, which protects the lender against loss up to the amount guaranteed.

12.     Under the Government Programs, if a homeowner defaults on a government loan and the mortgage holder forecloses on the property, the Government Programs will pay the mortgage holder the balance of the loan (or in the case of VA loans, up to 50% of the loan) and assume ownership and possession of the property.

13.     By protecting mortgage holders against defaults on mortgages, the Government Programs encourage lenders to make loans to millions of creditworthy citizens who might not otherwise be able to secure a home loan under conventional underwriting criteria.

14.     Government insurance is also valuable in the secondary markets, as government loans are expected to have met stringent underwriting requirements and because they are backed by the full faith and credit of the United States.

15.     Thus, for each loan underwritten, the government extends its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

16.     In addition, the taxpayer has been required to fund the insurance premiums for the Government Programs.

17.     Further, the government incurs significant administrative costs in running the Government Programs and accepting endorsed loans by Guaranteed Rate.

18.     In addition, the government paid claims on any loan that defaulted, including loss mitigation costs associated with the foreclosure or resale of properties, such as marketing expenses, real estate taxes, and maintenance costs.

19.     The government insures the government program loans only if the Direct Endorsement Lender certifies to the government that the loan specifically, and the Direct

Endorsement Lender's loan program in its entirety, meet the requirements set forth by the government.

20.     For these loans, the government guarantees that mortgage holders will be reimbursed by the government (in full for FHA loans, and up to 50% for VA loans) if the borrower ultimately does not repay the loan.

21.     The Government Programs encourage lenders to extend loans to creditworthy low- and moderate-income families, as well as first-time homebuyers.

22.     As part of insuring mortgage loans, the government has outsourced to FHA and VA lenders (individually and collectively, "Government Lenders") the underwriting services for the loan application; the government no longer performs its own underwriting services for governmentally insured mortgage programs.

23.     In addition to performing underwriting services as part of the program, the Government Lenders also profit from any loan approved.

24.     Further, because the government insured each loan endorsed by the Government Lenders, the Government Lenders suffer no risk of loss if the loan fails.

25.     That means that built into the government mortgage program is a strong incentive for a Government Lender to endorse as many loans as possible, even those that are not qualified, in order to maximize profits, provided the Government Lender is not caught approving bad loans.

26.     Endorsing fewer loans (even unqualified loans) only reduces a lender's profitability and puts it at a competitive disadvantage in relation to other Government Lenders who endorse more loans whether qualified or not.

27.     Therefore, given these incentives, ensuring that Government Lenders only

endorse loans that meet government mortgage requirements is an essential part of the program.

28.     Because Government Lenders are permitted to endorse loans for government insurance without prior government review, the government requires Government Lenders to conduct due diligence on loans before endorsing them for government insurance, and relies on the Government Lenders' certifications to the government in regards to their conduct.

29.     The Government Lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with the government; to follow the government's requirements; and to certify annually, as well as on each loan file, that the lender is in compliance with government requirements.

30.     These are the basic checks that exist to check a Government Lender's self-interest to underwrite as many loans as possible, regardless to the qualifications of the files.

31.     Guaranteed Rate, a Government Lender approved by the government to originate and underwrite single-family residential mortgages insured by the government, knowingly approved loans that violated government rules while falsely certifying compliance with those rules.

32.     From at least June 2011 to the present (the "Relevant Time Period"), Guaranteed Rate engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

33.     Guaranteed Rate's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.

34.     As the risk was entirely on the government, when the non-complaint loans

inevitably defaulted, this materialized into substantial losses to the government.

35.     Guaranteed Rate failed to live up to its obligations under the Government Programs.

36.     Guaranteed Rate's management instituted and encouraged practices that led underwriters to break HUD and VA rules and to approve ineligible loans.

37.     Some examples of these policies and practices include: paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program.

38.     More specifically, Guaranteed Rate's policies and practices included, among other things: improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculating borrowers' income using the amounts paid to an employee in a particular month and not borrowers' actual income; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to obtain verifications of deposit and bank statements to verify down payments; failing to get donor bank statements used to verify gift funds; failing to properly verify borrowers' down payments; failing to obtain donor bank statements to verify gift fund assets; deliberately excluding borrower debts discovered in credit reports; and improperly excluding borrowers' contingent liabilities.

39.     Guaranteed Rate established a culture that valued getting a loan endorsed for

government insurance over complying with the government's rules.

40. Guaranteed Rate's aim was to get loans insured by the United States and sold for a profit—even when Guaranteed Rate could not truthfully certify to the government that the loan qualified for government insurance.

41. Therefore, the United States seeks treble damages and penalties under the False Claims Act for the insurance claims paid by the government for mortgages wrongfully approved for government insurance by Guaranteed Rate.

## JURISDICTION AND VENUE

60. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

61. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

62. This Court has personal jurisdiction over Guaranteed Rate because Guaranteed Rate can be found and transact business in the Northern District of New York.

63. Guaranteed Rate maintains a branch located in this district at 60 Railroad Place, Suite 201, Saratoga Springs, New York 12866.

64. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because Guaranteed Rate can be found and transacts business within the Northern District of New York.

65. This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but upon rather information from Relator.

66.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.

67.     Relator has direct and independent knowledge of Guaranteed Rate's fraudulent activities.

68.     Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

69.     Relator shall serve on the United States a copy of this Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

70.     Defendant Guaranteed Rate, Inc. is a Direct Endorsement Lender and is authorized to, and in fact does conduct business in the Northern District of New York.

71.     Defendant Guaranteed Rate, Inc. is headquartered at 3940 North Ravenswood, Chicago, Illinois 606013.

72.     Defendant Victor Ciardelli was at all relevant times the founder and Chief Executive Officer of Guaranteed Rate, Inc., and upon information and belief, resides in Chicago, Illinois.

73.     Upon information and belief, Mr. Ciardelli, in concert with others, develops and manages Guaranteed Rate's policies and practices regarding underwriting, including for FHA and VA loans.

74.     For example, in a November 2015 blog entry, Mr. Ciardelli described Guaranteed Rate's desire to gain FHA market share.

75.     In that same blog entry, Mr. Ciardelli described FHA lending as "lucrative" and FHA loans "as easily processed" as conventional loans.

76.     Relator is a resident of the United States.

77.     Relator worked for Guaranteed Rate for two time periods, the first being from approximately February 2012 to approximately June 2013 ("Period 1") and the second being from approximately May 2015 to approximately November 29, 2016 ("Period 2").

78.     During her employment, Relator worked almost exclusively on underwriting on governmental loans, including under the FHA and VA programs.

79.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to FHA and VA loans.

80.     Additionally, Relator is Direct Endorsement certified through HUD under No. FG83.

## FACTUAL BACKGROUND

### *Civil Statutes to Combat Mortgage Fraud*

81.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

82.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(l)(B) (2010).

83.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information;

or (iii) acts in reckless disregard of the truth or falsity of the information" 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010).

84.    The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

85.    The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

86.    The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

87.    Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(G).

*HUD'S FHA Mortgage Insurance Program*

88.    HUD is a cabinet-level agency of the United States.

89.    HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

90.    HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

91.    FHA is a part of HUD and is one of the largest mortgage insurers in the world.

92.    Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.

93.    Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

94.    If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.

95.    HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default and has in fact done so repeatedly for Guaranteed Rate's loans.

96.    Guaranteed Rate, or whoever may purchase the loan from Guaranteed Rate, therefore suffers no loss when a borrower is unable to repay a government loan – only the government suffers the loss.

97. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.

98. Government mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

99. A lender, like Guaranteed Rate, must apply to be a Government Lender and must be approved by the government to underwrite government-insured mortgage loans on the government's behalf.

100. This is an important responsibility because the government "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).

101. Instead, the Government Lender underwrites mortgage loans on the government's behalf and is to truthfully certify to the government that the borrower presents an acceptable credit risk for the government.

102. Thus, in underwriting the mortgage loan, the lender is to certify that the borrower and the mortgage loan meet the government's requirements for insurance and that the "proposed mortgage is eligible for insurance under the applicable program regulations." *Id.*

103. The Government Lender must decide whether or not to approve the borrower for a government-insured mortgage loan.

104. After the Government Lender approves a borrower for a government-insured mortgage loan, the lender may submit the mortgage loan for government insurance (referred to as "endorsing" the loan) and as part of the submission process must also certify that the

mortgage loan itself, as well as the lender's entire mortgage loan program, is fully compliant with government requirements and thus can be insured by the government insurance fund in the event that the borrower cannot repay the loan.

105. Thus, the Government Lender must certify that the loan meets all of the government's requirements and the government relies on the DE certification to endorse the loan for government insurance.

106. Certain Government Lenders, such as Guaranteed Rate, apply to, and participate in, the DE Program in which the mortgagees themselves endorse the mortgage for government insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6.

107. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to the government only upon request. *See* Mortgagee Letter 2005-36; HUD Handbook 4000.1, II.A.1.a.i; HUD Handbook 4155.2, 8.B.1.d.

108. A Government Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with the government.

109. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.*, 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason*, 367 F.2d 289, 293 (1st Cir. 1966)).

110. As a result, in addition to the specific regulatory duties addressed below, the

Government Lender owes both a fiduciary duty and a duty of reasonable care to the government.

### HUD's Direct Endorsement Program

111.   The success of the DE Program depends upon proper underwriting of loan files.

112.   The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

113.   Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance, and ensure the integrity of the data relied upon to make such determinations.

114.   Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

115.   A lender must apply to be a Direct Endorsement Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf.

116.   The government relies on the truthfulness of the certification the lender completes on each loan certifying that the loan is eligible for government insurance.

117.   As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

118. Thus, the DE Lender, in exchange for the government's loan guarantee, provides underwriting mortgage services for HUD and determines whether a borrower presents an acceptable credit risk for HUD.

119. After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.

120. A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.

121. That responsibility includes performing due diligence and ensuring accuracy.

122. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of the government when underwriting loans for government insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims. *See* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 1.B.8.a; 1.B.8.b; 1.B.8.c.

123. Guaranteed Rate, as a Government Lender always remains responsible for the actions of its employees that participate in government transactions. *See* FHA Annual Certifications, *infra* ¶¶ 154-159; *see also* HUD Handbook 4000.1, I.A.6.i; HUD Handbook 4155.2, 9.D.6.b.

124. Guaranteed Rate, like any Government Lender, certified to the government that it was responsible for the actions of its employees. *See* FHA Annual Certifications, *infra* ¶¶ 154-159.

### The FHA's Due Diligence Requirements

125.   Proper due diligence is a critical component of the Direct Endorsement Program.

126.   It is required by federal regulation and HUD Handbooks.

127.   The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found.

128.   It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD.  See 48 Fed. Reg. at 11932 ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").

129.   "The entire scheme of government mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *Bernstein*, 533 F.2d at 797.

130.   In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.

131.   HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

132.   As a result of this fiduciary relationship, the Direct Endorsement Lenders owe the government a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with the government.

133.   A lender's due diligence should (1) "determine a borrower's ability and

willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1; *see also* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2, 2.A.4.b.

134.   Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.

135.   In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

136.   HUD has established specific rules for due diligence predicated on sound underwriting principles.

137.   In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Government Lenders and for which the government expects the Government Lender to fully comply. *See* HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a); HUD Handbook 4155.2, 2.A.4.b.

138.   At various times, the government has promulgated several handbooks detailing the rules and regulations for lenders underwriting government loans.

139.   Currently, the operative handbook is the HUD Handbook 4000.1-FHA Single Family Housing Policy ("HUD Handbook 4000.1") which went into effect on approximately September 14, 2015.

140.    Prior to the implementation of HUD Handbook 4000.1, the operative handbook was the HUD Handbook 4155.1 *Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties* ("HUD Handbook 4155.1") which was issued in approximately May 2009.

141.    As they say, these requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. 24 C.F.R. § 203.5(c).

142.    HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C; *see also* HUD Handbook 4000.1, I.B.3.a; HUD Handbook 4155.2, 2.A.3.a.

143.    When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing requirements, such as those set forth in the HUD Handbooks. *See* HUD Handbook 4000.1, II.A.5.a; HUD Handbook 4155.2, I.A.2.a.

144.    The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

145.    HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

146.    The Direct Endorsement underwriter must assume the following responsibilities:

- compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- the review of appraisal reports, compliance inspections and credit analyses

performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- the decisions relating to the acceptability of the appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

- the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

- and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

147.    Additionally, Direct Endorsement lenders are required to comply with the following HUD guidelines:

a.    Direct endorsement lenders may only engage in business practices that conform to generally accepted practices of prudent mortgage lenders. See FHA Title II Mortgagee Approval Handbook 4060.1, Section 2-10(D) (REV-2, August 14, 2006).

b.    Direct endorsement lenders may not engage in practices that demonstrate irresponsibility. Id.

c.    Direct endorsement lenders may only pay fees for services permitted by HUD program policy. Id. at Section 2-22.

d.    Direct endorsement lenders are required to function so as to protect the FHA from unacceptable risk. Id. at Section 7-2.

148.    The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).

149.    Mortgagees must also employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must

be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 2.A.4.b.

150.    The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2,1I2-9(A).

**Certifications and Endorsements for FHA Insurance**

151.    HUD requires Government Lenders to certify their compliance with the fiduciary, due diligence, quality control, and reporting requirements discussed herein.

152.    Direct Endorsement Lenders are required to certify their compliance with the FHA's programmatic and individual loan rules by certifying their compliance with government requirements, as well as governmental rules and regulations during their initial application to the government, on an annual basis, and on an individual loan-by-loan basis.

**FHA Initial Certifications to HUD**

152.    First, Guaranteed Rate as a lender applies to participate in the Government Lender program and to endorse loans for government insurance on the government's behalf, Guaranteed Rate certified that it would fully comply with all governmental guidelines, regulations, and requirements:

> I [Guaranteed Rate] certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

153.    Unless Guaranteed Rate submits a truthful initial certification to the

government, Guaranteed Rate would not be entitled to obtain or maintain its status as a

Government Lender or to endorse loans for government insurance.

*FHA Annual Certification Requirements*

154.    Even once Guaranteed Rate was initially certified, Guaranteed Rate must re-

certify, every year, that it is complying with the government's program requirements,

including due diligence in underwriting, following all governmental underwriting

requirements, and the implementation of a mandatory quality control plan.

155.    As of 2010, Guaranteed Rate was required to annually certify:

> I [Guaranteed Rate] certify that I know, or am in the position to know,
> whether the operations of [Guaranteed Rate] conform[s] to HUD-FHA
> regulations, handbooks, Mortgagee Letters, Title I Letters, and policies;
> and that I am authorized to execute this report on behalf of
> [Guaranteed Rate]. I certify that [Guaranteed Rate] complied with and
> agrees to continue to comply with HUD-FHA regulations, handbooks,
> Mortgagee Letters, Title I Letters, policies, and terms of any agreements
> entered into with [HUD]. I certify that to the best of my knowledge,
> [Guaranteed Rate] conforms to all HUD-FHA regulations necessary to
> maintain its HUD-FHA approval, and that [Guaranteed Rate] is fully
> responsible for all actions of its principals, owners, officers, directors,
> managers, supervisors, loan processors, loan underwriters, loan
> originators, and all other employees conducting FHA business for
> [Guaranteed Rate] . . . Each of my certifications is true and accurate to
> the best of my knowledge and belief. I understand that if I knowingly
> have made any false, fictitious, or fraudulent statement(s),
> representation, or certification on this form, I may be subject to
> administrative, civil and/or criminal penalties; including debarment,
> fines, and imprisonment under applicable federal law.

156.    As of approximately August 1, 2016, a corporate officer of Guaranteed Rate

was required to annually certify:

> I certify that I  . . . have known, or have been in the position to know,
> whether the operations of [Guaranteed Rate] conformed to all HUD
> regulations and requirements necessary to maintain the Mortgagee's
> FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1

> Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [Guaranteed Rate] and HUD.

157.   Guaranteed Rate also certifies that it is responsible for the actions of its employees, including managers, supervisors, originators, underwriters and processors:

> I acknowledge that [Guaranteed Rate] is responsible for all actions of its officers, partners, directors, principals, managers, supervisors, loan processors, loan underwriters, loan originations, and other employees of [Guaranteed Rate], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [Guaranteed Rate].

158.   Currently, Guaranteed Rate is additionally required to certify:

> I certify that, to the best of my knowledge and after conducting a reasonable investigation, [Guaranteed Rate] does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain [Guaranteed Rate's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [Guaranteed Rate] and HUD, except for those instances of non-compliance, if any, that [Guaranteed Rate] reported to HUD and for which [Guaranteed Rate] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [Guaranteed Rate] is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

159.   These annual certifications require compliance with the basic eligibility requirements for Government Lenders, which include compliance with the due diligence, quality control, and reporting requirements.

### Guaranteed Rate's annual certifications to the FHA on its operations

160.   Absent a truthful annual certification, Guaranteed Rate is not entitled to

endorse FHA loans for government insurance.

161.    Absent the applicable certifications in the annual certification described above, Guaranteed Rate cannot endorse loans for government insurance.

162.    Unless Guaranteed Rate had submitted a truthful annual certification, Guaranteed Rate is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

163.    The annual certification is material to the government's payment of any claim submitted under the Government Lender Programs.

164.    The government does not generally review lenders' operations; instead, it relies on lenders such as Guaranteed Rate to comply with the government's operational requirements and to ensure that the operational requirements are met.

165.    The certifications are required for Guaranteed Rate to enter and remain in the Government Programs.

166.    Guaranteed Rate's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance.

167.    Guaranteed Rate's certifications are essential for a claim on a loan to be submitted for government insurance.

168.    And Guaranteed Rate's certifications are needed to protect the government insurance fund from undue risk and loss.

### FHA Individual Loan Certifications

169.    Guaranteed Rate must also submit a certification to the government for each

loan for which it endorses for government insurance ("loan-level certifications").

170.   This is a certification to HUD that the individual loan complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD 92900-A.

171.   This loan-level certification can occur in two ways.

172.   One, Guaranteed Rate may use a government-approved automated underwriting system to review loan applications.

173.   An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."

174.   Numerous requirements promulgated by the government explain how Guaranteed Rate must calculate each data point and what documentation it needs to support each data point.

175.   For each loan that was underwritten with an AUS, Guaranteed Rate must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *See* FHA TOTAL Mortgage Scorecard User Guide; HUD Handbook 4000.1 II.A.4.a.iii(A)(1); HUD Handbook 4155.2 2.A.3.d.

176.   Guaranteed Rate must further certify that "there was no defect in connection with the approval of this mortgage such that the result reached in TOTAL should not have been relied upon and the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

177.   The automated underwriting system processes information entered by Guaranteed Rate and rates loans as either "accept/approve" or a "refer/caution."

178.   Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide.

179.   It is Guaranteed Rate's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1. In cases where Guaranteed Rate used a government-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," Guaranteed Rate made the following certification:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

180.   However, in cases where Guaranteed Rate uses a government-approved automated underwriting system, and the system rates a loan as "refer" or "caution," or when Guaranteed Rate does not use a government-approved automated underwriting system, Guaranteed Rate must make the following certification, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

181.   The certifications in HUD Handbook 4000.4, incorporated by reference in the certifications above, include Guaranteed Rate's certification that the mortgage complies with

the government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters.

182. Specifically, Guaranteed Rate certified that:

    i. The proposed mortgage meets the income and credit requirements of the governing law in the lender's judgment.

    ii. Guaranteed Rate used due diligence in underwriting the mortgage.

    iii. That the statements made in its application for insurance are true and correct.

    iv. Guaranteed Rate's statements made in the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

    v. Guaranteed Rate's underwriter makes all certifications required by Direct Endorsement Handbook, which include:

        1. The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

        2. The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

        3. The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

### The VA's Home Loan Guaranty Program

183. Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Program.

184. Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies.

185. To obtain a VA loan, a veteran must apply to a Government Lender.

186. If the loan is approved, the VA will guarantee a portion of the loan, which

protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan.

187.   By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans valuable on the secondary market.

188.   Many VA Lenders, including Guaranteed Rate, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval by the VA.

189.   To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements.

190.   Much like the HUD underwriting requirements, the VA underwriting requirements relate to such things as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

191.   In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines. *See* VA Lenders' Handbook, VA Pamphlet 26-7 at Ch. 4, *see also* 38 C.F.R. § 36.4340.

192.   The VA's underwriting guidelines contain rules that must be followed to ensure that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

193.   Further, for a loan to be entitled to coverage under the VA program, the VA requires that all loans be underwritten by an underwriter with a SAR number, signifying that she is a VA-approved underwriter in the VA program.

194.    Under the VA regulations, a SAR underwriter must have at least three years in process, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, §4.a.

195.    Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id.*

**VA Loan Certifications**

196.    The VA relies on Government Lenders to conduct due diligence on loans before approving them for the VA guarantee. *See id.* § 36.4340(j).

197.    To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.; see* VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

198.    To initially participate in the VA Program, each VA lender is required to certify compliance with the VA regulations for underwriting VA loans by submitting VA Form 26-8736.

199.    VA Form 26-8736 is an application for a lender to underwrite VA loans on an automatic non-supervised basis.

200.    As part of the express certifications made in this form, each VA lender agreed and certified that it would, amongst other things: that it would: comply with Title 38 of the United States Code, VA regulations and other directives issued by the VA; it would notify

the VA of any change in its corporate structure, operations, or financial condition which would have a bearing on its qualifications to automatically underwrite loans; that it will not close loans on an automatic basis as a courtesy or accommodation for other mortgage lenders regardless of whether or not such lenders are approved themselves to close on an automatic basis, nor will it close loans on the automatic basis for any builder, real estate brokerage firm or other entity which it owns, is owned by, is affiliated with or has a financial interest in, without the express approval of the Department of Veterans Affairs; that it will not process loans that it does not itself intend to make; that all prospective VA loans to be closed on an automatic basis will be reviewed and either approved or rejected by an approved underwriter; and that the lender will take responsibility for all credit information; i.e., credit report, verifications of employment and deposit, and disclose the sources of such information.

201. VA Form 26-8736 must be signed by the president or principal officer for each VA lender.

202. Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. *See* 38 C.F.R. § 36.4340(k).

203. Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

204.   Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans."

**Guaranteed Rate's certifications to the Government Programs on individual loans**

205.   Absent a truthful loan application certification, Guaranteed Rate is not entitled to endorse a particular loan for government insurance.

206.   Absent the applicable certifications for an individual loan as described above, Guaranteed Rate cannot endorse that loan for government insurance.

207.   Unless Guaranteed Rate had submitted a truthful loan-level certification, Guaranteed Rate is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

208.   Each of the foregoing certifications is material to the government's payment of any claim submitted under the Government Lender Programs.

209.   The government does not review government loans for approval prior to the loan being endorsed for insurance; instead, it relies on lenders such as Guaranteed Rate to comply with the government's requirements and to ensure that every loan is in fact eligible for government insurance.

210.   The certifications are required for Guaranteed Rate to enter and remain in the Government Programs.

211.   Guaranteed Rate's certifications are critical to the government's ability to

ensure that only qualified and eligible loans are endorsed for government insurance.

212.   Guaranteed Rate's certifications are essential for a claim on a loan to be submitted for government insurance.

213.   And Guaranteed Rate's certifications are needed to protect the government insurance fund from undue risk and loss.

### *Defaulted loans result in losses to the government*

214.   Once a loan is endorsed by Guaranteed Rate, it is insured by the government on the basis that that the Government Lender has followed the government requirements and has submitted accurate certifications and that the loan is eligible for government insurance.

215.   Additionally, Guaranteed Rate's annual certifications ensure that Guaranteed Rate has met all of the government's requirements on both a programmatic and individual loan basis.

216.   Without those requirements being met, any loan submitted by Guaranteed Rate is not eligible for government insurance.

217.   It is only because a Government Lender endorses a loan for government insurance that the holder of the mortgage is able to submit a claim to the government for any losses.

218.   If the borrower defaults, the holder of the mortgage can submit a claim to the government for any loss from the default.

219.   The holder submits a claim for insurance by using HUD's electronic claim system.

220.   The claim must include certain information.

221.   Each loan that is endorsed for FHA insurance has a unique FHA case number,

and the claim must include the FHA case number.

222.   If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

223.   The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

224.   FHA pays these insurance claims in two parts.

225.   First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

226.   Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

227.   These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically.

228.   The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.

229.   After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

230.   The damages sustained by the United States as a result claims on the government resulting from Guaranteed Rate's conduct takes several forms.

231.   First, the United States sustains losses in the form of "net losses" whereby the

amount of proceeds received by the government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the loan or claim amount.

232.    Additionally, any costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

233.    In other words, the loss to the government on the loans is adjusted for any proceeds received by the government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

234.    Thus, for each loan underwritten, the government extended its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

235.    In addition, the taxpayer has been required to fund the insurance premiums for the FHA program.

236.    Further, the government incurs significant administrative costs in running the FHA program and accepting endorsed loans by Guaranteed Rate.

237.    In addition, the government paid claims on any loan that defaulted.

### Guaranteed Rate's national scheme to defraud the Government Programs through deliberately and recklessly approving ineligible loans for government insurance

238.    As described below, Guaranteed Rate knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with the government's underwriting requirements, and thus were not eligible for government mortgage insurance.

239.    From at least June 2011 to the present, Guaranteed Rate engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to

the government that these loans were eligible for government insurance.

240.    Guaranteed Rate focused on maximizing these profit-making schemes across all locations in the company.

241.    In addition, Guaranteed Rate established national underwriting policies and practices.

242.    The policies described in this complaint reflect Guaranteed Rate's nationwide loan and underwriting polices which are used interchangeably at all its locations.

243.    For example, Relator is aware that Guaranteed Rate's national underwriting policies and interpretations were established by individuals such as Bradley DeKuiper, Guaranteed Rate's National Underwriting Manager.

244.    Additionally, Relator is aware that emails discussing Guaranteed Rate's underwriting policies and practices were communicated to its underwriting staff throughout the United States.

245.    From at least June 2011 to the present, Guaranteed Rate has engaged in a regular policy and practice of reckless origination and underwriting of its government loans and falsely certified to the government that those loans were eligible for government insurance.

246.    Furthermore, Guaranteed Rate knowingly was aware of certain underwriting processes that deliberately ignored and recklessly disregarded government requirements that would result in Guaranteed Rate endorsing materially deficient loans for government mortgage insurance.

247.    Additionally, Guaranteed Rate pushed for increased loan volume that came at the expense of loan quality.

248.    But Guaranteed Rate's management failed to take effective action to address the seriously deficient loan originations and underwriting that it knew was occurring.

249.    The underlying causes of Guaranteed Rate's very serious loan quality problems and reckless underwriting are multifold, several of which are detailed in this Complaint.

250.    In this case, Guaranteed Rate instituted a series of policies that replaced its fiduciary obligation with one that maximized its profits and sales.

251.    Guaranteed Rate's interest was underwriting as many government loans as possible, secure in the knowledge that if it was not caught, the government would pay for any defaulted loans.

252.    The proximate and natural result of Guaranteed Rate's process was to endorse loans that defaulted at a significantly higher rate than comparable mortgagees, which was borne out by its statistics.

253.    Guaranteed Rate's policies caused it to endorse loans that defaulted at a higher rate than comparable mortgagees.

254.    Guaranteed Rate's government insured loans were so problematic that over the past two years, FHA loans from Guaranteed Rate have resulted in claims, or have seriously delinquent payments (payments over 90 days due which often signal a likely complete default on the loan) that have exceeded the national average for other government loan lenders at a significantly higher rate.

255.    HUD's Neighborhood Watch database provides data information for tracking the performance of loans originated, underwritten, and serviced by FHA-approved lending institutions.

256.    The system is designed to provide information about the performance of loans

that are originated, underwritten and serviced by FHA-approved lending institutions by highlighting instances of high defaults and claims among lending institutions by geographic area, loan characteristic, and other factors.

257.    According to the HUD Neighborhood Watch for the two-year data of the performance period through April 30, 2017, the rate of loans that are seriously delinquent or have resulted in claims against HUD is 1.15%, while the national average for all mortgagees is 1.02%.

258.    Further, according to the HUD Neighborhood Watch data, the United States has paid at least eleven claims for FHA mortgage insurance to Guaranteed Rate since approximately March 2013.

259.    Therefore, Guaranteed Rates still maintains a significantly higher percentage of loans that result in claims against the government or had borrowers who were seriously delinquent in terms of payment in comparison with other lenders.

***Guaranteed Rate falsely represented to the government that it was not paying commissions to employees performing underwriting services.***

257.    Government regulations do not allow a Mortgagee to compensate an employee who performs underwriting functions with commissions. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(ii).

258.    Therefore, Guaranteed Rate, as a mortgagee, "must not compensate employees who perform underwriting...activities on a commission basis." *Id.*

259.    This helps to ensure that employees performing underwriting functions are making decisions completely on the merits of the individual file and not incentivized to approve mortgages because of the potential to be paid a commission.

260.   Government regulations also prohibit an employee from having multiple sources of compensation, either directly or indirectly, from a single FHA-insured transaction. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(v)

261.   Further, Guaranteed Rate agreed to follow such regulations.

262.   Guaranteed Rate, however, as part of its scheme to profit off of government subsidized mortgage insurance, knowingly compensated its employees who performed underwriting activities on governmental files on a commission basis in order to get as many files approved as possible, even when those files did not meet the government's requirements.

263.   Guaranteed Rate only paid the commission to the underwriter if the employee approved the file and it was funded for government insurance.

264.   This amounted to a "kick-back" from Guaranteed Rate to its employees when a loan was approved and created a conflict of interest because the employee's compensation was dependent on both supposedly meeting government requirements, as well as trying to get the loan endorsed even it did not meet those requirements.

265.   The compensation plan was company-wide and was applied to employees performing underwriting functions throughout the underwriting process, not just underwriters, but employees with other job titles, including Processor.

266.   When Relator first came to work for Guaranteed Rate in 2012, Guaranteed Rate offered her a position in which Guaranteed Rate explicitly promised they would pay at least a $25 commission on any governmental file she approved and was ultimately closed, which was similar to the commission they paid other employees performing underwriting functions on governmental loans.

267.   Just as during her first period of employment, during her second period of employment by Guaranteed Rate, Guaranteed Rate paid Relator, as an employee performing underwriting functions, commissions on any governmental file she approved and was funded for governmental insurance.

268.   Additionally, under Guaranteed Rate's commission plan, Guaranteed Rate paid higher commissions When the Underwriter approved files on weekends.

269.   Guaranteed Rate's commission plan existed throughout the Relevant Time Period.

270.   This commission plan was implemented as part of Guaranteed Rate's overall scheme to create an underwriting approval process that pushed through bad quality government loans in order to increase Guaranteed Rate's profits and thus providing a non-conforming underwriting service for the government for which the government paid funds.

271.   By implementing this commission plan, Guaranteed Rate incentivized employees performing underwriting functions to approve as many governmental loans as possible even if it meant endorsing deficient files.

272.   The plan meant that employees were financially rewarded by having more governmental files approved regardless of whether the file government requirements because the $25 was not paid if the loan was declined or never funded.

273.   To the degree the employee spent time on files he or she did not approve, that time would reduce his or her overall potential compensation and Relator heard comments from other underwriters noting that they wanted files to be approved so they could collect the commission.

274.    Therefore, Guaranteed Rate's commission compensation plan was designed by Guaranteed Rate to put financial pressure on employees to approve a government file in order to increase their compensation.

275.    Significantly, Guaranteed Rate did not compensate employees with commissions for following government requirements in underwriting government files.

276.    Instead, commissions were only paid if government files were approved, and were paid regardless of whether the file complied with government requirements or not.

277.    Consistent with the Guaranteed Rate's goals, the commission payments were meant to, and did in fact, encourage employees performing underwriting functions to endorse loan applications in which the applicant's qualifications did not conform to the government's requirements.

278.    For example, because processors were paid more based on how many files they got approved, processors would hide or remove documents from applications that would otherwise result in the denial of the governmental loan.

279.    Additionally, if a loan was suspended, the Processor lost his/her commission on the file completely.

280.    Relator attempted to catch as many of these deliberate falsifications as possible, and in response the processors would complain that by following the governmental requirements, the processors were not going to get, or would get on a delayed basis, their commissions for file approval.

281.    The processors made clear to Relator that their files did not face the same level of scrutiny from other underwriters and that therefore they received commissions more often when they worked with other underwriters who would approve such files.

282.   Repeatedly, and at least once a month during her employment, a Processor would tell Relator that that while Relator had declined a particular file for not meeting governmental guidelines, another Underwriter had recently approved a file with the same or even worse disqualifying characteristics and the Processor could not understand why Relator needed to follow the government requirements in approving loans.

283.   Guaranteed Rate's illegal commission payment plan did in fact motivate Guaranteed Rate's employees to approve loan in which the applicant's qualifications did not conform to the government guidelines.

284.   Relator told Guaranteed Rate's management in or around March 2013 that the payment of these commissions created a "conflict of interest" that rewarded the approval of improper files.

285.   None of Guaranteed Rate's management disagreed with Relator, but they continued the policies because that is precisely the incentive Guaranteed Rate intended to create.

286.   Relator repeatedly complained to every one of her managers (during both periods of her employment) about processors trying to get improper files approved surreptitiously, in part for the extra compensation.

287.   These conversations occurred on a monthly basis during both periods of Relator's employment.

288.   Relator repeatedly expressed concerns that in a number of cases she just happened to stumble across the hidden documents and she worried about the problems in files where she did not happen to see the disqualifying documents, as well as documents being hidden in the files of other underwriters.

289.    Relator also told all her managers that it was unacceptable that processors were allowed to try to slip files through in the hopes of getting a bonus and that Guaranteed Rate never once disciplined a processor for doing so.

290.    Relator asked that Guaranteed Rate impose real consequences on processors who attempted to slip improper files through.

291.    Relator raised these complaints continually to Guaranteed Rate's management, including Bradley DeKuiper (National Underwriting Manager), Stacey Chastain, Tom Welch, Angela Evers, Kym Murphy, and Carol Walters.

292.    However, Guaranteed Rate's management, despite being told what processors were doing, refused to take any remedial action to discourage processors from trying to slip bad files through.

293.    To the contrary, Guaranteed Rate continued their policy of financially rewarding the processors every time the processor managed to find a way to get a file approved, whether it met governmental requirements or not.

294.    Given that Guaranteed Rate knew, or should have known, that its commission payment plan did motivate the endorsement of non-qualified applicants, regardless of the regulations' requirements, Guaranteed Rate's conduct was improper for a government lender.

295.    Further, Guaranteed Rate's representations to the government that it was not engaging in such conduct are false.

**_Guaranteed Rate falsely represented to the government that it was not pressuring employees to endorse bad loans._**

296.    Proper due diligence is a critical component of the Direct Endorsement Program. _See_ HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2 2.A.4.b.

297.    It is required by federal regulation and government handbooks.

298.   Guaranteed Rate, however, as part of its scheme to profit off of government subsidized mortgage insurance, knowingly pressured employees to endorse loans that should be endorsed with due diligence and then repeatedly certified to the government that it was not doing so.

299.   Put simply, Guaranteed Rate is required to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

300.   Guaranteed Rate improperly pressured its employees through a use of both incentives and disincentives.

301.   For example, as discussed above, Guaranteed Rate illegally paid commissions to employees performing underwriting functions based on the approval of loans which incentivized the writing of bad loans.

302.   Additionally, when Relator or others raised issues about loan applications that did not meet governmental requirements, Guaranteed Rate and its management pressured employees to approve bad loans.

303.   As just some examples, when Relator told managers about problems in governmental loan applications, they would tell Relator to underwrite the file anyway, using phrases like, "Be a deal maker," or "Think outside the box," or "Make it work."

304.   Additionally, Guaranteed Rate would tell governmental underwriters to approve unqualified files because the loan originator was important in the business.

305.   One crucial component of this policy was underwriters had to call a manager before any file was declined.

306.   In that conversation, one of the most important questions asked of the Underwriters is "Who is the Loan Officer on the file?"

307.   However, the identity of the specific loan officer on the file is, or at least should be, irrelevant to a discussion about why a file is being declined. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii).

308.   Instead, at Guaranteed Rate, which loan officer was handling the file was an important consideration in the process.

309.   For example, Guaranteed Rate would ask underwriters to give the "red carpet treatment" to highly valued loan officers, which was code by Guaranteed Rate for wanting the underwriter to overlook deficiencies in loan applications.

310.   On other occasions Guaranteed Rate would be excited about a new Loan Officer being hired from a larger lender.

311.   In an effort to impress these new Loan Officers, if the loan application did not meet the underwriting requirements, Guaranteed Rate would tell the Underwriter to ignore the issues and "show him we can get the loans done."

312.   Additionally, when the Loan Officer was a member of President's Club, almost invariably, the manager would then explain to the Underwriter that the file cannot be declined.

313.   Guaranteed Rate's President's Club recognized Loan Officers that reached certain monetary thresholds in funded loans, typically $30,000,000 in sales each year.

314.   The manager would then push for an approval, or barring that, at least just a suspense of the file and the underwriter providing a path for the improper file to be approved.

315.   This was required by Guaranteed Rate's management including, but not limited to, Tom Welch, Carol Welch, Stacey Chastain and Kym Murphy.

316.   One example of such favorable involving treatment is discussed below in ¶¶ 407-415.

317.   Further, Guaranteed Rate pressured employees to approve improper governmental insured loans by demanding that the files be reviewed and approved in timeframes that Guaranteed Rate knew would not allow for a proper amount of time to correctly determine if the files complied with governmental requirements.

318.   For example, Guaranteed Rate inflexibly required that each governmental underwriter underwrite/approve two (sometimes three) files a day—a requirement that, particularly when combined with Guaranteed Rate's commission plan, strongly incentivized governmental underwriters to approve as many files a day as possible without regard to quality.

319.   In addition to the requirement that each underwriter underwrite a minimum of two new files a day, Guaranteed Rate also demanded that governmental underwriters in addition underwrite all "resubmissions" (files in which problems had supposedly been cleared up) in under 48 hours, again another requirement that Guaranteed Rate knew was not feasible on all files if the underwriter actually followed governmental requirements.

320.   Guaranteed Rate knew that both requirements together certainly did not allow for the proper underwriting of all governmental applications but instead pressured for the approval of unqualified files to meet those time requirements.

321.   As a handful of examples over s short time period demonstrate how insistently Guaranteed Rate communicated this nationwide policy to its employees performing underwriting functions.

322.   For example, in the Fall of 2016 Guaranteed Rate's Underwriting Manager told underwriters–including those working on government loans–that:

a.   "Everyone needs to UW a minimum of 2 new files today. Please continue to keep resubmissions @ 24-48 hours."

b.   "Everyone has a minimum of 2 new files....All new files & resubmissions from the 18[th] or before need to be out today. "It is extremely important that everyone underwrites a minimum of 2 new files" a day.

c.   "Same goals - UW a minimum of 2 new files and resubmissions at 24-48 hours. For those of you off Friday [the day after Thanksgiving], please make sure all resubmissions are done today."

d.   "Same goals – UW a minimum of 2 new files and resubmissions @ 24-48 hours.....Watch the time resubmissions came in. 4:01pm is considered the next day."

e.   "Same goals, UW a minimum of 2 new files & resubmissions @ 24-48 hours."

323.   Similar written and verbal comments were made to governmental underwriters throughout the Relevant Time Period to make clear that these quotas were imposed by Guaranteed Rate.

324.   For example, during Relator's first period of employment, Relator's manager, Tom Welch, Regional Underwriting Manager, would call her and any other underwriter who did not meet their quota the day before and ask why they were one (or more) files short of quota.

325.    Similarly, Susan Metzger, Senior Vice-President for Underwriting, repeatedly stressed the requirement that underwriters meet their daily quotas—and never once coupled such statements with any similar exhortations to make sure the files were properly approved.

326.    Guaranteed Rate's pressure was applied continually, as was evident during Relator's second period of employment, in which underwriters were pressured to underwrite files in such short time frames that it induced improper approvals.

327.    For example, Cheryl Dubose, Senior Vice President National Underwriting, would have weekly phone calls with underwriters in which she repeatedly emphasized the requirement to meet daily underwriting quotas and to not decline loans without management approval.

328.    There were not similar admonitions to perform quality underwriting.

329.    To further pressure underwriters to not do a complete review on governmental applications, Guaranteed Rate would not allow overtime payments to governmental underwriters to complete the review of the two files.

330.    As Guaranteed Rate's Underwriting Manager told governmental underwriters, "OT – if you are not underwriting a minimum of 2 new files per day, there is no reason for OT. OT is being watched again."

331.    Further, Guaranteed Rate would publish charts and rankings comparing the number of files underwritten among underwriters to praise underwriters who underwrite a large volume of files and shame underwriters who spent more time reviewing files to approve files faster like other underwriters.

332.    Guaranteed Rate distributed e-mails ranking the Underwriters monthly.

333.    Those who underwrote files quickly were called "Rock Stars" in the e-mails and praised for the volume (but not quality) of their production.

334.    Additionally, at all monthly phone calls by the Senior Vice President National Underwriting, production was the central focus.

335.    Relator's manager, Carol Walter, would make the same comments in her phone calls with her team.

336.    Guaranteed Rate made statements to underwriters on these monthly calls such as:

> a. Review the report and see where you are. Find out what you need to do be higher on the list.
>
> b. Look at your teammates. Talk to them. See what they do to do that level of volume. Do the same.
>
> c. This business will slow down. The first people who will be laid off are the lowest producers. You don't want to be one of those.

337.    The Senior Vice President National Underwriting implemented a compensation plan in May 2015 in which bonuses were paid based on larger quantities of files underwritten by an Underwriter than under Guaranteed Rate's previous compensation plans.

338.    No charts were published showing the accuracy or quality of the underwriting by the various underwriters.

339.    This was part of Guaranteed Rate's scheme to value the quantity of underwriting over the quality because the more loans Guaranteed Rate could require the government to insure, the more money Guaranteed Rate made without any risk.

340.    Guaranteed Rate knew its quota and commission system put particular pressure for underwriters to approve governmental applications.

341.    The reason was because government applications took much more time to review correctly in comparison with conventional loans.

342.    Guaranteed Rate was aware of a number of reasons for this including, among others that the typical governmental application came from lower credit individuals than a conventional loan, meaning the files generally could not be approved as quickly if done properly and that the governmental requirements for its insured files were more onerous than those of conventional mortgages.

343.    Therefore, by compensating government underwriters with the same system as conventional underwriters, and applying the same quota pressures to them, only intensified the push to approve files that had not been fully reviewed.

344.    In fact, one of the reasons that Guaranteed Rate knew that its pressure on governmental underwriters was designed to push through more files with less review was because Relator repeatedly told Guaranteed Rate that the requirements were not workable with a proper review of governmental applications.

345.    Relator repeatedly told her managers that one could not meet the quota without "cutting corners" on government files; that Relator would not be able to do her "due diligence" on the files; and that to properly underwrite a government file, it took longer than the amount of time allotted by Guaranteed Rate's quota system.

346.    Relator's manager responded with comments like, "don't worry about it;" "we know;" and "you're fine."

347.    Despite its knowledge of the effect of their quota system, and despite the complaints of Relator, Guaranteed Rate never modified their quota requirements.

348.   It did not change the quota system because the system generated exactly what Guaranteed Rate knew and wanted it to do: the approval of as many government files as possible, whether qualified or not.

349.   As discussed below, shortly after Relator escalated her concerns and documented them in writing to Guaranteed Rate's management Relator was terminated, as discussed in more detail below.

350.   Guaranteed Rate's pressure was designed to push through the approval of improper loans because Guaranteed Rate's goals did not provide a realistic amount of time for an underwriter to make a proper decision on most applications for government insured loans.

351.   Consistent with Guaranteed Rate's goals, Guaranteed Rate's pressure was meant to, and did in fact, encourage employees performing underwriting functions to endorse loan applications in which the applicant's qualifications did not conform to the government's requirements yet still receive government insurance.

352.   Given that Guaranteed Rate knew, or should have known, that its pressure did motivate the endorsement of non-qualified applicants, regardless of the regulations' requirements, Guaranteed Rate's conduct was improper for a Direct Endorsement lender.

353.   Further, Guaranteed Rate's representations to the government that it was not engaging in such conduct are false.

***Guaranteed Rate falsely represented to the government that it did not have a management "override policy" under which management overrode government requirements and encouraged employees to do so as well***

354.   Government regulations only allow for the endorsement of loans that meet all of the government lending requirements. *See* HUD Handbook 4000.1, I.B.3.a. and II.A.

355.   As set forth above, for each FHA loan Guaranteed Rate endorsed, Guaranteed Rate also certified that, as to the loan, there was "no defect in connection with my approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

356.   Additionally, for each VA loan that Guaranteed Rate endorsed, Guaranteed Rate certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36."

357.   Despite being required to comply with all government requirements, Guaranteed Rate instead created a management override process under which management would dictate that loans being endorsed even if they did not meet the government's requirements.

358.   Guaranteed Rate required that a government underwriter could not decline a loan—even one that did not meet government requirements—without getting manager involvement, and under Guaranteed Rate's management override policy, managers would then often direct the underwriter to override the loan requirements and approve the file.

359.   If an underwriter called asking for permission to decline a loan file, under Guaranteed Rate's management override policy, management would first cycle through the pressure techniques cited above.

360.    If that was not successful, Guaranteed Rate's override policy had the manager order the override whenever Guaranteed Rate believed they could do so without being caught.

361.    One technique was having the underwriter identify any problematic information in the file and then taking that information back to the loan officer and "coaching" the applicant on how to submit new, incorrect information for the file.

362.    As just some examples, Relator repeatedly saw "corrected" documents come in after the original document made the file unqualified for government insurance.

363.    These included Verification of Employment forms where the first Verification of Employment reflected income that was insufficient to qualify for a loan.

364.    Suddenly, just after the Loan Officer became aware of the problem, the applicant would send over a new Verification of Employment that reported greater compensation.

365.    Relator remembers that occurring on multiple files, and sometimes even more than two Verifications of Employment would be sent suddenly reflecting greater income from the same employer without explanation.

366.    Guaranteed Rate would "burn" the earlier Verification of Employment by throwing them away, or putting the Verification of Employment in the Ops Left Side of the applicant's file where they would not be visible to the government or investors.

367.    Similarly, a borrower would provide bank statements with large unexplained to deposits.

368.    When the borrower was unable to prove an acceptable source for the funds, Guaranteed Rate would "burn" those bank statements as described above.

369. Shortly thereafter the borrower would resubmit the paper work but not include any statements from the bank.

370. Further, the same amount of unexplained large deposit would now suddenly appear again on another bank statement but be "backed up" this time by a claimed gift fund.

371. Then Guaranteed Rate's management would then order an "override" of the earlier denial or suspense on the basis of the manipulated information.

372. As part of this process, as described above, Guaranteed Rate's management would order the disqualifying documents removed from the borrower's file so they would not be seen.

373. Alternatively, managers would simply take files from an underwriter who would not approve the improper file and turn them over to a more compliant underwriter who would follow management's override direction.

374. Another mechanism to carry out Guaranteed Rate's management override policy was by moving conditions to close and post-close.

375. At Guaranteed Rate, DE underwriters conduct an initial review of all loans and approve a subset of loans for FHA insurance with conditions.

376. These conditions—which relate to all aspects of the loans, including the borrower's income, assets and credit—must be satisfied before the loans can close and be endorsed for government insurance consistent with the government's underwriting rules.

377. After a loan has been approved with conditions, as part of Guaranteed Rate's management override policy, Guaranteed Rate granted management the power to move conditions to closing or post-closing.

378.   The conditions that Guaranteed Rate "moved" to close or post-close included material conditions related to approval of the loan.

379.   This functionally meant that management overrode these governmental requirements.

380.   At Guaranteed Rate, licensed CHUMS underwriters would not review file post-close, and generally were not present for closings.

381.   In fact, at closings, Guaranteed Rate created a "Closing Table Remedy Desk" which would automatically clear conditions that had been designated as closing conditions.

382.   The desk was not staffed by the Underwriters who underwrote the file, nor was the desk staffed by qualified DE Underwriters.

383.   Regardless, if a condition was designated as a condition of closing, Guaranteed Rate knew it would be cleared automatically by the Closing Remedy Desk which was not staffed by DE qualified underwriters.

384.   If the condition was moved to post-close, it was never reviewed at all.

385.   That meant that Guaranteed Rate knew that by moving to move a condition to close or post-close would result in the condition not being met or reviewed by a licensed underwriter.

386.   Relator saw a number of such violations when she was employed by Guaranteed Rate.

387.   For example, if someone started a new job, government regulations required that the lender see a paystub reflecting 30 days of pay.

388.   Under Guaranteed Rate's management override policy, Relator saw on multiple occasions Guaranteed Rate's management moving this condition to closing or post-closing.

389.   That meant the loan was endorsed for government insurance without the requirements for the insurance being met; further, Guaranteed Rate never actually had an underwriter review the file to see if the paystub actually came in at any point even after the loan had closed.

390.   As just another example, Relator would put a condition on a file because the appraisal required that certain repairs be done in order to have the house appraised at a certain value in order to qualify for governmental insurance.

391.   Management would override the governmental requirement by moving the condition that the appraiser signs off on the repairs to post-close.

392.   Again, that meant that the loan was insured without the required value requirements of the government regulation being met; further, Guaranteed Rate never even checked to see if the repairs were made.

393.   As just another example, Relator would put a condition on a file because the gift funds for a particular loan were not verified as required by governmental regulation.

394.   Guaranteed Rate's management pursuant to the management override policy would move this requirement to close or post-close.

395.   At close it was not possible to actually verify that the gift funds were properly traced, and post-close there was no verification at all.

396.   In either case, Guaranteed Rate's management override policy meant that the government assumed exposure for loans that had not meant the government's requirements.

397.   As just another example, government regulations require that applicant's debts be below a certain level.

398.   Relator would condition approval of a file on proof that the appropriate amount of debts were paid off (for examples, credit card or judgments).

399.   Under Guaranteed Rate's management override policy, Guaranteed Rate's management would move those conditions to close or post-close.

400.   The problem was that at close, if the debts or judgment were not paid off, the borrower was simply asked to be sure to mail the checks in to pay off the loans; there was no proof that the debts were actually paid.

401.   Even more for post-close, there was no proof that the debts were actually paid.

402.   Because there was no proof that the debts were actually paid in either case, Guaranteed Rate was extending governmental exposure to liability without having met the requirements to do so and falsely representing to the government that they were in fact doing so.

403.   By having management override the governmental requirements, Guaranteed Rate knew it was not in compliance with governmental regulations but falsely told the government that it was meeting those requirements.

404.   Further, Guaranteed Rate would tell employees that they themselves should unilaterally grant such overrides in similar cases.

405.   Guaranteed Rate's management made clear if they had ordered an approval of a file contrary to the government requirements in a particular case, they expected that to be followed in all future cases and that the Underwriter should not raise it again.

- 55 -

406.    Only if management said this was a management decision on this file only and not "carte blanche," that meant the override should not be granted again without management approval.

407.    As just one example of the override policy, Relator remembers reviewing a loan application that was brought in by Guaranteed Rate's loan officer Shimmy Braun in 2012 or early 2013.

408.    Mr. Braun was one of Guaranteed Rate's favored Loan Officers described above.

409.    The file Mr. Braun brought in, however, clearly did not come close to meeting the government requirements on many fronts, including income, assets, credit, etc.

410.    As required, Relator called Stacey Chastain in Guaranteed Rate's management before declining the governmental loan file.

411.    Ms. Chastain initially agreed that there was no way the file could be approved because it was "slam dunk denial."

412.    As the call was wrapping up, Ms. Chastain asked Relator who was the loan officer on the file.

413.    When Relator reported that it was Mr. Braun, consistent with Guaranteed Rate's policy and practice, Ms. Chastain's tone immediately changed.

414.    She then directed that the file be approved and "put through on a letter"— meaning that all problematic areas of the file be rectified simply with letters generated at the request of Guaranteed Rate's processor to the borrower, even though those letters did not comply with the proof required by the regulations, and even though those letters did not accurately reflect the borrowers' financial situation.

415.     Guaranteed Rate in fact funded the inappropriate loan and with governmental insurance.

416.     Guaranteed Rate's management was aware of the management override process, both by creating it and then making the overrides from FHA-HUD policies with it.

417.     Because of the management overrides, Guaranteed Rate succeeded in its goal of underwriting more guaranteed loans even though those loans did not qualify for insurance coverage.

*Guaranteed Rate falsely represented to the government that employees performing underwriting functions were not being managed by mortgage origination activities.*

417.     Government regulations require that underwriters are not managed by any individual who performs mortgage origination activities. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(vi)

418.     Similarly, Government regulations prohibit mortgage origination employees from giving anything of value to employees performing underwriting functions. See HUD Handbook 4000.1, I.A.6.h.

419.     This help ensures that the independent judgment of an underwriter is not influenced by origination goals.

420.     Here, however, Guaranteed Rate allowed those performing origination functions to supervise those making lending decisions.

421.     For members of President's Club, each Loan Officer was assigned his or her own dedicated underwriters and processors.

422.     Those underwriters and processors would only work on files for the Loan Officer to which they assigned.

423.   Those Loan Officers would in turn supervise and provide input on the performance of those employees assigned to him or her, and this supervision had a significant impact on the employee's evaluation and compensation.

424.   This was particularly important because working for a member of President's Club was considered to be a very good assignment that an employee did not want to lose.

425.   In addition, those Loan Officers would give additional pay and things of value for the Underwriters and Processors on their team to reward the approval of files.

426.   This would include monetary payments, fancy dinners, spa days, direct cash payments through PayPal, and other things of value to encourage the approval of files.

427.   As just one of many examples, Steve Swinski would buy Rebecca Highland, an Underwriter working for him, purses costing approximately $1,000 every Christmas in the years 2011-2015 for her assistance on the approval of files.

428.   Consistent with Guaranteed Rate's goals, Guaranteed Rate's subordination of underwriting management to the sales staff was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still received government insurance.

429.   Given that Guaranteed Rate knew, or should have known, that having the sales force manage underwriting decisions would result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, Guaranteed Rate's conduct was improper for a Direct Endorsement lender.

***Guaranteed Rate falsely represented to the government that it was not manipulating variables in the AUS/Total system in order to endorse FHA loans for unqualified buyers.***

430.   As described above, the government has a credit-rating algorithm maintained by the FHA known as TOTAL Mortgage Scorecard—that works in conjunction with

Guaranteed Rate's automated underwriting system ("AUS")—to obtain "accept/approve" ratings for its FHA loans.

431.    TOTAL rates loans as either "accept/approve" or "refer" based on data points that Guaranteed Rate enters into its AUS, including, for example, the dollar value of the borrowers' income and assets.

432.    Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating.

433.    Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating.

434.    Because TOTAL cannot analyze data that is not available to it, certain loans are not eligible for AUS approval and must be manually underwritten.

435.    "A manual downgrade becomes necessary if additional information, not considered in the AUS decision, affects the overall insurability or eligibility of a mortgage otherwise rated as an accept or approve." FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.

436.    While a lender is not required to have a DE underwriter review the credit portion of an AUS approved loan, a lender must have qualified staff review AUS approvals to ensure a loan that receives an "Accept/Approve" decision is in fact eligible for an AUS approval.

437.    To ensure the integrity of TOTAL's decision, as well as the integrity of the data TOTAL relies upon, lenders are prohibited from "manipulating . . . application variables [in] TOTAL mortgage scorecard to obtain an accept/approve classification." *See* Mortgagee

Letter 2005-15; HUD Handbook 4000.1, II.A.4.a.iii(A)(1) and II.A.4.a.iv; HUD Handbook 4155.1, 6.A.c.

438.    If TOTAL does not approve a loan with an "Accept/Approve" decision, it returns a "Refer" decision, meaning the loan is referred back to the lender for manual underwriting.

439.    Lenders must then have a DE underwriter perform a manual underwrite and determine if the loan is approvable under the FHA's manual underwriting requirements. *See* 24 C.F.R. § 203.255(b)(5)(i)(B).

440.    For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (i.e., income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating.

441.    Rather, as made clear by the 4000.1 Handbook, "If a determination is made that the Mortgage must be downgraded to manual underwriting, the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage." *See* HUD Handbook 4000.1, II.A.4.a.vi.

442.    The prohibition on entering unsubstantiated data points into an AUS/TOTAL exists, among other reasons, to protect against fraud.

443.    TOTAL is not to be used by sales people to manipulate fake variables in attempt to figure out how to get an "approve" score from the system.

444.    For instance, if a Direct Endorsement Lender entered factually unsupported income or asset amounts into an AUS—and thereby determined the precise amount of

income or assets necessary to obtain an "accept/approve" rating from TOTAL the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets.

445. That is why the regulations require that a Mortgagee's employees cease using the system as soon as the result is a "refer." *See* HUD Handbook 4000.1, II.A.4.a.iv(c).

446. As part of its scheme to approve government loans that it was presented, Guaranteed Rate systematically manipulated the data that was entered into Guaranteed Rate's AUS/TOTAL system to determine variables that would lead to an "accept/approve" rating from TOTAL.

447. Thus, in order to get around a "refer" rating from AUS, Guaranteed Rate would manipulate AUS by isolating one or more variables (e.g., the borrower's income) and slightly yet systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating, even though the financial situation of the borrower had not changed between the runs.

448. After identifying the qualifying variable amount(s), Guaranteed Rate's employees would then communicate that information to the borrower, thus inviting the borrower to create and submit fraudulent documents reflecting the qualifying variable amount(s).

449. There is simply no legitimate, fiduciary basis to re-run AUS multiple times on the same loan file unless the lender is attempting to manipulate the system even though the financial situation of the borrower had not changed between these runs.

450.   Relator is aware that Guaranteed Rate would run the AUS at least twenty times for a single file several times each month.

451.   Guaranteed Rate ran the AUS multiple times in order to deliberately obtain "approve" status from the AUS, as opposed to "refers" that would have required much more stringent underwriting.

*Guaranteed Rate improperly inflated borrowers' incomes in order to approve ineligible loans*

452.   Guaranteed Rate falsely certified to the government that it was properly calculating borrowers' income in determining whether to approve a governmental loan even though it knew it was not doing so.

453.   Guaranteed Rate's policy of improperly calculating a borrower's income manifested itself in a variety of methods, some examples of which include: improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculating borrowers' income using the amounts paid to an employee in a particular month and not borrowers' actual income; and improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week. Given the significance of a borrower's income to the borrower's ability to make continued payments on a loan, the FHA guidelines set strict standards for the proper calculations of income to be made.

454.   For example, under HUD Handbook 4000.1 II.A.4.c.v(B), a lender may only use a borrower's overtime and bonus income if the borrower has received that income for the past two years and it is reasonably likely to continue.

455.    Furthermore, under HUD Handbook 4000.1 II.A.4.c.v(C), for borrowers with overtime or bonus income, the lender must average the income earned over the previous two years.

456.    Despite the above regulations, Guaranteed Rate improperly inflated borrowers' income by using overtime and bonus income that the borrower had received for less than two years and/or was not likely to continue.

457.    Relator recalls that Guaranteed Rate's Regional Underwriting Managers Kim Murphy, Angela Evers, Tom Welch, Stacy Chastain, and Carol Walter told her to use improper calculations related to overtime and bonuses.

458.    Guaranteed Rate's Regional Underwriting Managers justified using improper overtime and bonus income by stating that "we can justify it" or "we're okay" despite the fact that the Regional Underwriting Managers, who had their CHUMS numbers, knew such calculations were contrary to the government guidelines.

459.    For example, Relator recalls one FHA loan where Guaranteed Rate used the overtime income of a borrower that was not supported by a two-year history and the borrower was unlikely to continue earning.

460.    On this loan, the borrower was an hourly employee eligible for overtime who had worked a lot of overtime over a short period of time when the borrower's employer had opened a new store.

461.    Relator also recalls multiple situations in which Guaranteed Rate used bonuses as part of a borrower's income despite the fact that the bonuses were year-end bonuses that fluctuated significantly between years.

462. Relator also witnessed Guaranteed Rate use one-time "sign on" bonuses as part of a borrower's income in order to approve loans.

463. Although it was clear that these "sign on" bonuses were not going to continue as they were clearly conveyed as one-time bonuses in offer letters, Guaranteed Rate would include the bonuses in the borrower's income calculation.

464. Guaranteed Rate would instruct underwriters to place these offer letters in "Ops Left Side" to conceal their existence as Guaranteed Rate knew these documents would show that the bonuses were not likely to continue to be earned by the borrower.

465. Despite the fact that Guaranteed Rate had improperly inflated borrowers' income using bonus and overtime earnings, Guaranteed Rate approved and submitted such loans for government insurance.

466. Further, as an additional form of improperly inflating borrowers' income, Guaranteed Rate impermissibly calculated income using the amounts a borrower receive in paychecks within a particular month, not the borrower's actual income.

467. In other words, Guaranteed Rate inflated the income by intentionally calculating the borrowers' year-to-date income in months when a borrower had more "paydays" than the typical month.

468. For example, for a borrower that earned a salary pay of $2500 bi-weekly, the borrower's monthly income would be $5416.67. However, in order to inflate the borrower's income, Guaranteed Rate would instead use the year to date gross income divided by the period ending date on the pay stub for the period covering March 26, 2017 through April 8, 2017, and paid on April 14, 2017.

469.   In this same example, if the borrower was paid on April 14, 2017 showing the year to date income as equal to $20,000, Guaranteed Rate would calculate the borrowers' income as $20,000 divided by 3.267 months equaling $6,121.82 per month of qualifying income as opposed to $5,416.67 actual earnings.

470.   Guaranteed Rate would then multiply the borrower's monthly income by twelve months to reflect the borrowers' yearly income, in this example, $73,461.84.

471.   However, as the borrower's take-home pay in this example was only $65,000, Guaranteed Rate's improper calculation of income grossly inflated the borrower's income.

472.   Despite the fact that Guaranteed Rate had improperly inflated borrowers' income by using the amounts paid to a borrower instead of the amounts actually earned over a period of time, Guaranteed Rate approved and submitted such loans for government insurance.

473.   As yet another example of how Guaranteed Rate improperly inflated borrowers' income, Guaranteed Rate would calculate the effective income of employees paid on an hourly basis based on a forty hour workweek, even when the borrowers were not regularly working at least forty hours in a week.

474.   Under HUD Handbook 4000.1 II.A.4.c.iii(C)(2), for employees who are paid hourly and whose hours vary, a lender must average the income over the previous two years.

475.   Despite this regulation, Guaranteed Rate improperly calculated the effective income of borrowers with inconsistent schedules.

476.   For example, Relator is aware that for Guaranteed Rate's internal file number 161470152, Guaranteed Rate calculated the borrower's effective income by averaging the borrower's 2015 W-2 earnings.

477.    As this borrower had a flexible scheduled that resulted in working less than 40 hours in a week, Guaranteed Rate could not use such a calculation to determine the borrower's effective income unless the borrower's income was averaged over a two year period.

478.    However, Carol Walter indicted to Relator that she used the 2015 W-2 earnings averaged over a twelve month period to calculate the income and that post-closing, Ms. Walter wanted the borrower's "next paycheck that supports the 40 hrs. per week" to be obtained.

### Guaranteed Rate Failed to Properly Verify Borrowers' Down Payments

479.    Guaranteed Rate also falsely certified to the government that it was properly verifying borrowers' minimum investment requirement.

480.    Contrary to this rule, Guaranteed Rate did not obtain the required verifications of deposit and bank statements for borrowers to verify their down payments.

481.    Under the FHA program, borrowers are typically required to make a minimum down payment of 3.5% of the purchase price. *See* HUD Handbook 4000.1, II.A.4.d.ii(A).

482.    Additionally, a lender must verify a borrower's down payment by obtaining a written verification of deposit and the borrower's most recent bank statements. *See* HUD Handbook 4000.1, II.A.4.d.i(A).

483.    Relator recalls that on one file that Guaranteed Rate underwrote in approximately March 2013, where Relator was the Regional Underwriting Manager, underwriter Tammy Vaughn identified a file where a borrower did not have the required 3.5% down payment.

484.    The loan officer on this file, Steve Siwinski, called Relator and yelled at Relator that the file needed to be cleared to close immediately.

485.    When Relator reviewed the file, Relator saw that Guarantee Rate could only approve the loan if the borrower's large deposits were included as part of the borrower's assets.

486.    However, the borrower's account revealed that the borrower had two large deposits that had not been verified.

487.    Relator was told by her manager, Angela Evers, that Guaranteed Rate was going to include the borrower's large deposits despite the fact that Guaranteed Rate had not properly verified the borrower's deposits.

488.    In a phone call that same day, Angela Evers told Relator that Steve Siwinski was in Guaranteed Rate's "President's Club" and that as such, Guaranteed Rate wanted to keep Mr. Siwinski happy to keep his business.

489.    Ms. Ever's point was clear, as Mr. Siwinski was in the President's Club, Relator could not allow a purchase to "blow up" moments before it would have closed.

490.    Ms. Evers subsequently told Relator that the loan was to be approved using the large deposits, despite the fact that Guaranteed Rate had not obtained the required documents.

491.    Despite the fact that Guaranteed Rate failed to obtain the required verifications of deposit and bank statements from the borrower, Guaranteed Rate approved and submitted this loan and other similar loans for government insurance.

*Guaranteed Rate deliberately failed to obtain the proper documentation of borrowers' gift fund assets*

492.   Guaranteed Rate falsely certified to the government that it was verifying and obtaining proper documentation of borrowers' assets, even though Guaranteed Rate knew that it was not doing so.

493.   Specifically, Guaranteed Rate failed to obtain the required bank statements from donors who were providing gift funds.

494.   Gift funds are funds provided by another person other than the borrower (such as family member) to assist the borrower with the down payment on a government loan.

495.   Proper verification of gift funds is extremely important to the DE Program because if gift funds are provided by an improper source (such as the seller) or if in fact the funds are not actually a gift (and would require repayment and interest payments), this would substantially increase the likelihood that the borrower could not meet the loan's monthly mortgage payments and the loan would be declined.

496.   Under HUD Handbook 4000.1, II.A.4.d.iii(F)(3), a DE Lender must verify and document the transfer of gift funds from the donor to the borrower by either: (1) in the event that the gift funds have been verified in the borrower's account, obtaining bank statements from the donor showing the withdrawal and evidence of the deposit in the borrower's account' or; (2) in the event that the gift funds have not been verified in the borrower's account, by obtaining a certified check or money order or cashier's check or wire transfer or other official check, *and* a bank statement showing the withdrawal from the donor's account.

497.   Despite the above regulations, Guaranteed Rate routinely failed to obtain the requisite bank statements from donors for gift funds.

498.   Relator witnessed Guaranteed Rate approve numerous loans for FHA insurance despite the fact that Guaranteed Rate did not obtain bank statements from donors.

499.   Upon seeing a loan that did not have the required donor bank statements in approximately June 2015 where Guaranteed Rate had only obtained a cashier's check and a gift letter for the gift funds, Relator raised concerns with Guaranteed Rate that donor bank statements were needed in order to meet the required governmental regulations.

500.   When Relator refused to approve this loan, Relator received several emails from her "POD" (a group of loan officers, processors, and loan assistants) indicating their displeasure with Relator's declination and conditioning of the file.

501.   Relator subsequently had a phone call with her Regional Underwriting Manager, Tom Welch, who indicated that Guaranteed Rate did not need to obtain the bank statements from the donor.

502.   After Relator emailed Tom Welch a copy of the FHA guidelines showing that donor bank statements were required, Tom Welch responded that "the gift letter is the source."

503.   Tom Welch subsequently told Relator that the loan was to be approved and that Guaranteed Rate did not need donor bank statements for any other similar loans.

504.   Relator ultimately approved the loan in approximately June 2015 and it was submitted for government insurance shortly thereafter.

505.   Guaranteed Rate continually submitted loans for government insurance that lacked donor bank statements in regards to gift funds until approximately September 2015 when Guaranteed changed its policies and began requiring donor bank statements as Relator had long told Guaranteed Rate.

506.    Additionally, Relator recalls that she spoke with one of Guaranteed Rate's post-purchase audit specialists in approximately June or July 2016 about Guaranteed Rate's practice of failing to get the required donor bank statements.

507.    During this conversation, the auditor stated that Guaranteed Rate had a lot of loans that had deficiencies because Guaranteed Rate had not acquired the proper donor bank statements until it stopped that practice in approximately September 2015.

508.    The post-purchase audit specialist noted to Relator that "it is what it is" and that he understood that Guaranteed Rate's managers were the ones who had pushed the file through.

509.    Despite the fact that Guaranteed Rate had identified these material deficiencies on the loans during the post-purchase audit process, Relator is not aware that Guaranteed Rate self-reported any loans that it knew had material deficiencies.

**Guaranteed Rate deliberately excluded debt obligations in order to obtain approvals**

510.    Guaranteed Rate falsely certified to the government that borrowers' debt obligations were within the ratios allowed by the government in order to obtain approvals by deliberately excluding certain debts of borrowers.

511.    Under the applicable governmental regulations, a borrower's total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%. *See* HUD Handbook 4155.2, 4.C.3.c; HUD Handbook 4000.1 II.A.5.d.viii.

512.    Additionally, under the VA's applicable regulations, a borrower's total debt-to-income ratio may not exceed 41%. VA Pamphlet 26-7, Chpt. 4, 10.b.

513.   Guaranteed Rate's policy of excluding documentation of borrowers' assets and down payments was done in a number of ways, including improperly excluding certain debts and contingent liabilities of borrowers.

514.   Under HUD Handbook 4000.1, II.A.4.b.iv(A), in calculating the DTI ratio, the borrower must include all applicable monthly liabilities in determining the borrower's debt obligations unless such debts will be paid off within ten months and the cumulative payment of such debts is less than or equal to 5 percent of the borrower's monthly gross income.

515.   Similarly, under the relevant VA regulations, debts and obligations must be deducted from the effective income when those debt obligations have a remaining term of 10 months or more, or where any debt obligations of less than ten months would cause a severe impact on a family's resources for a period of time. *See* VA Pamphlet 26-7, Chpt. 4, 5.c.

516.   Despite these regulations, Relator is aware that Guaranteed Rate would regularly ignore debt obligations that would cause a borrower's debt-to-income ratios to exceed the maximum allowable amounts under the relevant government insurance program.

517.   Prior to the loan closing, Guaranteed Rate would perform soft credit pulls.

518.   During this process, the new credit reports indicated that borrowers had new debts, including auto loan debts, that would be monthly debt obligations for hundreds of dollars each month.

519.   When underwriters reviewed the new and previously undisclosed debt obligations, they realized that the loans would exceed the allowable debt-to-income ratios.

520.   In such situations, underwriters were instructed to speak with their managers who would make the "business decision" to ignore the new debts that appeared on the soft credit reports.

521.   Relator is aware that these business decisions were made by individuals such as Cheryl Debose and Tom Welch to ignore the government underwriting requirements.

522.   Underwriters were further instructed to move the adverse credit reports to "Ops Left Side."

523.   Despite the fact that these loans had debts that caused the borrowers' debt-to-income ratios to exceed the maximum amounts, Guaranteed Rate approved and submitted such loans for government insurance.

524.   Additionally, under HUD Handbook 4000.1 II.A.4.b.iv(L)(2), a DE Lender must include monthly payments on contingent liabilities in the calculation of the borrower's monthly obligations unless the lender verifies and documents that there is no possibility that the debt holder will pursue debt collection against the borrower should the other party default or the other legally obligated party has made 12 months of timely payments.

525.   A contingent liability refers to a liability that may result in the obligation to repay only when a specific event occurs. *See* HUD Handbook 4000.1, II.A.4.b.iv(L)(1).

526.   For example, a contingent liability exists when an individual can be held responsible for the repayment of a debt if another legally obligated party defaults on the payment. *Id.*

527.   Further, if a government lender does not wish to include the cosigned liability in the calculation of a monthly obligation, the government lender must obtain documentation to evidence that the other party to the debt has been making regular on-time

payments during the previous 12 months, and does not have a history of delinquent payments on the loan. *See* HUD Handbook 4000.1, II.A.4.b.iv.(L)(4)(b).

528.  Evidence that the other party on a debt has been making regular on-time payments would require documentation such as twelve months of cancelled checks.

529.  Similarly, under the relevant VA regulations, a Government Lender may exclude the contingent liability from the calculation of the net effective income calculation if: (1) there is evidence of loan payments being made by someone else, and (2) there is no reason to believe that the borrower will have to participate in the repayment of the other loan. VA Pamphlet 26-7, Chpt. 4, 5.d.

530.  Despite the above regulations, Relator is aware that Guaranteed Rate would fail to include contingent liabilities for the purposes of excluding borrowers' debt obligations.

531.  For example, Relator recalls a loan where a borrower had a car loan that showed the borrower was the only individual on the loan.

532.  The borrower claimed that another individual was making payments on this loan, creating a contingent liability situation.

533.  However, Guaranteed Rate never obtained any cancelled checks from the other person supposedly making the car loan payments, and instead excluded the debt obligations on the justification that the borrower was not the person responsible for making the auto loan payments.

534.  Despite the fact that Guaranteed Rate improperly excluded such debts, Guaranteed Rate approved and submitted such loans for government insurance.

***Guaranteed Rate failed to maintain an adequate quality control program.***

535.   A Direct Endorsement Lender is required to maintain a quality control program to ensure the quality of its  government-insured mortgages.  HUD requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

536.   The quality control program must be designed to meet the goals of assuring compliance with FHA's requirements, protecting FHA from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2.   The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines.  HUD Handbook 4060.1, REV-2, ch. 7-6.C; see also HUD Handbook 4700.2, REV-1, ch. 6-1.D.

537.   When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.

538.   For instance,"[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor['s] employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds."  HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

539.   If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.  "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested

third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

540.    At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.  The HUD Handbook recommends a "system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review. The system should enable a mortgagee to compare one month['s] sample to previous samples so the mortgagee may conduct trend analysis." HUD Handbook 4060.1, REV-2, ch. 7-4.

541.    HUD recommends four types of ratings. The ratings provided for this purpose are:

- "Low Risk", i.e., no problems or minor problems were identified with loan servicing or origination;

- "Acceptable Risk," i.e., the issues identified were not material to the "creditworthiness, collateral security or insurability of the loan";

- "Moderate Risk," i.e., a failure to address significant unresolved questions or missing documentation has created moderate risk for the mortgagee and the FHA; and

- "Material Risk," i.e. the issues identified were "material violations of FHA or mortgagee requirements and represent an unacceptable level of risk."

542.  Examples of "material risk" are violations that include a "significant miscalculation of the insurable mortgage amount or the applicant['s] capacity to repay, failure to underwrite an assumption or protect abandoned property from damage, or fraud." HUD Handbook 4060.1, REV-2, ch. 7-4.D.

543.    These findings trigger mandatory reporting obligations. Mortgagees "must report [Material Risk] loans, in writing," to HUD. *Id.*

544.   A lender is also required to report to HUD "[f]indings of fraud or other serious violations" that are discovered "during the normal course of business and by quality control staff during review/audits of FHA loans." HUD Handbook 4060.1, REV-2., ch. 7-3.J. *See also* HUD Handbook 4000.1, V.A.2.d.iv; HUD Handbook 4155.2, 1.B.8.a, I.B.8.b and I.B.8.c.

545.   The lender must report these findings, along with the supporting documentation, within 60 days of when the lender first discovers them. *Id.*; HUD Handbook 4060.1, REV-2, ch. 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.").

546.   Since November 2005, Direct Endorsement Lenders such as Guaranteed Rate have been required to make such reports through HUD's online Neighborhood Watch Early Warning System. *See* Mortgagee Letter 2005-26.

547.   Internal reporting of findings is also required.

548.   Quality control review findings must "be reported to the mortgagee[']s senior management within one month of completion of the initial report" HUD Handbook 4060.1, REV-2, ch. 7-3.I.

549.   In addition to appropriate reporting, lenders must act to address the problems they identify.

550.   "Management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify actions being taken, the timetable for their completion, and any planned follow-up activities." *Id.*; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.F.

551.   FHA regulations require that a mortgagee train its employees to ensure that its staff knows all the current underwriting requirements for FHA loans. HUD Handbook 4000.1, V.A.2.b.i(A)(I)(a); *see also* HUD Handbook 4155.2, 2.A.4.b.

552.   Despite these programmatic requirements, Guaranteed Rate failed to provide underwriting staff with training and feedback on underwriting errors.

553.   Although Relator is aware that Guaranteed Rate had government loans with significant errors, Guaranteed Rate failed to take any substantive steps to provide training and corrective measures to address these errors.

554.   For example, although Relator was aware that pursuant to Guaranteed Rate's improper policies her loans often contained significant and noticeable defects, such as missing bank statements or improper calculations related to income, Relator only received one report from the quality control department during her entire employment indicating an underwriting error.

555.   Given the frequency with which Relator was told by her managers to submit ineligible loans for approval, Relator expected to receive far more reports from Guaranteed Rate's quality control department indicating errors discovered on her files.

556.   Guarantee Rate's failure to provide underwriters with information regarding audit findings, prevented underwriters from gaining useful information and experience that would assist them in increasing and approving compliance with applicable standards and requirements.

557.   As another fundamental quality control issue, Guaranteed Rate also failed to provide its underwriting staff with the updated rules and regulations pertaining to the government lending programs.

558.   For example, Guaranteed Rate never provided underwriters with updated regulations or mortgagee letters issued by HUD, and Relator recalls the only updates provided to her by Guaranteed Rate were when HUD switched from the 4155.1 to the 4000.1 handbooks.

559.   Guaranteed Rate also engaged in conflicts of interests, such as nepotism.

560.   Guaranteed Rate's Head of Audit (Kevin Welch) is the son of its National Head Underwriting Manager, Thomas Welch.

561.   This created a conflict of interest between these positions.

562.   Further, such an arrangement does not exhibit the due diligence and fiduciary duty required of Government Lenders.

563.   Relator repeatedly witnessed that Kevin Welch would agree that there were problems with loan applications, or even independently identify additional problems with files, but would not be able to act on his concerns because he was afraid his father would not agree with his decision.

564.   Consistent with Guaranteed Rate's goals, Guaranteed Rate's lack of a thorough underwriting process was designed to, and did result in, the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still receive government insurance.

565.   Given that Guaranteed Rate knew, or should have known, that a lack of a quality control process and training did result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, Guaranteed Rate's conduct was improper for a Direct Endorsement lender.

***Guaranteed Rate retaliated against Relator by terminating her in violation of the FCA***

561.   The False Claims Act contains an anti-retaliation provision that prevents employers from retaliating or otherwise discriminating against employees who engage in protected activity under the statute. 31 U.S.C. § 3730(h).

562.   This protected activity includes not only "lawful acts done by the employee" such as filing a False Claims Act case, but also includes "other efforts to stop 1 or more violations of [the FCA]." *Id.*

563.   Therefore, employers may not retaliate against employees who have engaged in investigatory or oppositional activity related to fraud against the government.

564.   Relator was terminated by Guaranteed Rate on November 29, 2016.

565.   This termination occurred shortly after Relator commented both verbally and in writing that Guaranteed Rate was engaged in mortgage fraud against the government.

566.   Throughout her employment, Relator repeatedly protested against Guaranteed Rate's approval of files with material deficiencies.

567.   This included instances, among others for example, where Guaranteed Rate manipulated borrowers' income, ignored debt obligations, and did not obtain donor bank statements for gift funds.

568.   Relator repeatedly complained to her managers that these files did not meet government guidelines, and on at least two occasions, refused to approve the loans.

569.   On several occasions, as Guaranteed Rate prohibited employees from using the "F" word of "fraud," Relator wrote emails to her managers expressing fraud concerns by writing that "I have concerns about the integrity of the file."

570.    Due to her efforts to oppose Guaranteed Rate's approval of ineligible loans for government insurance, in the approximate three to four months prior to her termination, Kim Murphy told Relator that she was a "dealbreaker" and "difficult to work with."

571.    Ms. Murphy also indicated that the loan officers in her POD did not want Relator working on her files due to her efforts to adhere to the government's guidelines.

572.    On approximately November 22, 2016, Relator also wrote an email to Carol Walter opposing Guaranteed Rate's policy of requiring underwriters to underwrite two files a day.

573.    Relator explained that Guaranteed Rate's requirements were not realistic if a mortgagee wanted governmental loans reviewed properly, given the greater burdens on properly approving governmental loans.

574.    As discussed above, Guaranteed Rate's commission and quota requirements were not compatible with underwriting loans that met governmental requirements because it incentivized employees to conduct cursory and minimal review of loan files.

575.    Realtor explained not only were the requirements objectively unrealistic, but it was also unrealistic for Guaranteed Rate to expect proper underwriting on governmental files if the payment and quota plans were the same for governmental loans and conventional loans because those loans could generally be reviewed more quickly.

576.    This written protest was the culmination of months of complaints by Relator that Guaranteed Rate was not allowing adequate time to properly review government loans.

577.    Guaranteed Rate's repeated response was to blame the Relator for not meeting quotas and to reduce her potential commission income—even while acknowledging that the

excellent quality of Relator's underwriting on governmental files and never seriously dispute any of Relator's claims about the effect of Guaranteed Rate's pay and quota policies.

578.    Shortly after Relator's written protest about the effect of Guaranteed Rate's policies on underwriting and governmental loans, Guaranteed Rate terminated Relator's employment.

579.    Guaranteed Rate in its termination explicitly acknowledged the quality of Relator's underwriting on governmental files, but claimed that she was being fired for production issues.

580.    This reason was pretextual and masked the retaliatory reason for the discharge.

581.    Relator had met her most recent production quota from Guaranteed Rate.

582.     Guaranteed Rate did not terminate other employees who did not meet their production goal.

583.    Nor did Guaranteed Rate terminate other employees whose underwriting quality was far worse than Relator's.

584.    In some senses Guaranteed Rate did accurately state in part the reason for the termination: it was due to Relator's protests about Guaranteed Rate's production requirements on government loans that was the reason for her termination.

***Guaranteed Rate knowingly made false statements to the government in regards to the quality of Guaranteed Rate's underwriting process and the quality of Guaranteed Rate's endorsed loans.***

585.    Guaranteed Rate did not want the government to know that it was underwriting files illegally, or that Guaranteed Rate was breaking its contractual agreements.

586.   Guaranteed Rate therefore made false statements to the government to induce the government to extend insurance coverage on home loans, as well as pay for losses on covered loans.

587.   Guaranteed Rate made these false certifications repeatedly in regards to its underwriting process.

588.   Each false certification independently triggers Guaranteed Rate's liability.

589.   In addition, the purpose, as well as the actual outcome, of Guaranteed Rate's improper practices of paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program was to push Guaranteed Rate's employees to endorse loans in which the applicant fell below government's requirements for insuring the loans as described in ¶¶ 125-150 and 191-195.

590.   Guaranteed Rate's illegal policies and practices therefore induced these knowing, false statements set forth in ¶¶ 152-182 and 196-204 and Guaranteed Rate is independently liable for such false statements knowingly induced by its commission pay plan.

*Annual certifications*

591.   As set forth above, Guaranteed Rate submitted an annual certification to HUD in every year that it was a member of the Direct Endorsement Lender program.

592.    For fiscal years 2012-2016 Guaranteed Rate annually certified to the federal government that the operations of Guaranteed Rate had been, and was, in conformance with all applicable HUD-FHA regulations and handbooks.

593.    From the years 2016 to the present Guaranteed Rate annually certified to the federal government that the operations of Guaranteed Rate had been, and were, in conformance with HUD Handbook 4000.1 Sections I and V, and any agreements between Guaranteed Rate and HUD.

594.    However, Guaranteed Rate was not in compliance with these HUD-FHA requirements in a number of ways.

595.    For example, Guaranteed Rate made false, specific representations about the quality of the services they were providing.

596.    Guaranteed Rate annually certified they were providing HUD-FHA compliant underwriting services when they knew they did not, and had no intention of providing such services.

597.    Among other things Guaranteed Rate knew this statement was false because Guaranteed Rate was paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program even though Guaranteed Rate contracted not to engage in such conduct and the government regulations forbade Guaranteed Rate from engaging in such practices.

598.    Additionally, Guaranteed Rate knew this statement was false because Guaranteed Rate had been, and intended to continue, its policies and practices of: paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program, even though Guaranteed Rate contracted not to engage in such conduct and HUD-FHA regulations forbade Guaranteed Rate from engaging in such practices.

599.    Guaranteed Rate was also not in compliance with all HUD-FHA requirements because they knowingly endorsed loans that fell below the HUD-FHA requirements.

600.    This included improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculating borrowers' income using the amounts paid to an employee in a particular month and not borrowers' actual income; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to obtain verifications of deposit and bank statements to verify down payments; failing to get donor bank statements used to verify gift funds; failing to properly verify borrowers' down payments; failing to obtain donor bank statements to verify gift fund assets; deliberately excluding borrower debts discovered in credit reports; and improperly excluding borrowers' contingent liabilities.

601.    Thus, when Guaranteed Rate stated in its annual certification that its operations conformed to HUD-FHA requirements, Guaranteed Rate knew this statement was false because Guaranteed Rate had (and intended to continue) to endorse such deficient files.

602.    These representations on the annual certifications were designed by Guaranteed Rate to, and in fact cause, the government to extend government funded insurance coverage and pay insurance claims on non-conforming home loans.

603.    In submitting these annual certifications, Guaranteed Rate did not disclose its non-compliance with these important regulatory and contractual requirements which made Guaranteed Rate's certifications false statements.

*Loan-level certifications*

604.    As set forth above, for each FHA loan Guaranteed Rate endorsed, Guaranteed Rate also certified that, as to the loan, there was "no defect in connection with my approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900-A.

605.    Additionally, for each VA loan that Guaranteed Rate endorsed, Guaranteed Rate certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36."

606.    Although Guaranteed Rate, through its employees and agents, certified that the process to approve the loan had "no defect," had that the loan itself had been approved

"in accordance with FHA requirements," Guaranteed Rate knew such certification on those loans was not accurate.

607. Guaranteed Rate submitted these false loan-level certifications on virtually every business day from June 2011 to the present.

608. Among other things, as discussed above, Guaranteed Rate knew this statement was false because Guaranteed Rate had a defective underwriting process in place for the approval of the mortgage and that the loan itself did not meet the governmental requirements.

609. Specifically, Guaranteed Rate knew that, among other things, Guaranteed Rate was paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program, and doing so even though Guaranteed Rate contracted not to engage in such conduct and the government regulations forbade Guaranteed Rate from engaging in such practices.

610. In addition, as a result of Guaranteed Rate's scheme to push though unqualified loans, Guaranteed Rate endorsed loan files that did not qualify under the government's underwriting requirements.

611. This included improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculating borrowers' income using the amounts paid to an employee in a particular month and not borrowers'

actual income; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to obtain verifications of deposit and bank statements to verify down payments; failing to get donor bank statements used to verify gift funds; failing to properly verify borrowers' down payments; failing to obtain donor bank statements to verify gift fund assets; deliberately excluding borrower debts discovered in credit reports; and improperly excluding borrowers' contingent liabilities.

612.    Therefore, Guaranteed Rate's statement on the loan-level certification, that the loan met all government requirements, was false.

613.    Among other things Guaranteed Rate knew this statement was false because Guaranteed Rate knowingly made improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculated borrowers' income using the amounts paid to an employee in a particular month and not borrowers' actual income; improperly calculated the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failed to obtain verifications of deposit and bank statements to verify down payments; failed to get donor bank statements used to verify gift funds; failed to properly verify borrowers' down payments; failed to obtain donor bank statements to verify gift fund assets; deliberately excluded borrower debts discovered in credit reports; and improperly excluded borrowers' contingent liabilities.

614.    Despite Guaranteed Rate's representations that they were endorsing compliant FHA and VA loans, Guaranteed Rate knew they were in fact delivering non-conforming loans to the government.

*Materiality*

615. The false statements by Guaranteed Rate were material in inducing the government to extend insurance coverage to loans endorsed by Guaranteed Rate and to pay claims on government loans that had been endorsed by Guaranteed Rate.

*Annual certifications*

616. As set forth above, the purpose of the regulations, and the purpose of Guaranteed Rate's annual certification that they were following the regulations, was to ensure that Guaranteed Rate's underwriting operations met acceptable underwriting standards for FHA-insured loans.

617. A reasonable person would not have extended loan insurance on a loan file, and certainly not provided it at the lower rates offered in the governmental program, if she knew that Guaranteed Rate was not following the required underwriting process, including paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program, particularly when Guaranteed Rate was falsely certifying that they were in compliance with the regulations banning such practices.

618. A reasonable person would not have allowed Guaranteed Rate to participate in the DE Program if she knew that Guaranteed Rate was not following the required underwriting process to participate in the Direct Endorsement Program, including important contractual and regulatory requirements such as paying commissions to employees

performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program, particularly when Guaranteed Rate was falsely certifying that they were in compliance with the regulations.

619.   Guaranteed Rate knew that the government attached importance to these annual certifications that Guaranteed Rate was in compliance with the regulations.

620.   Among other things, the government required these annual certifications before extending insurance coverage to Guaranteed Rate's endorsed loans, and before allowing Guaranteed Rate to participate in the Direct Endorsement Program.

621.   Further, the regulations define such violations as "material."

622.   The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and Guaranteed Rate: Guaranteed Rate would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to Guaranteed Rate's loans based on Guaranteed Rate's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; not allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system

to "work backwards" to find values that would allow a loan to be approved; and maintaining an adequate quality control program.

623.   Therefore the government was expressly clear that a condition of extending insurance coverage to Guaranteed Rate's endorsed loans, and the government's ultimate payment on any losses was that Guaranteed Rate annually certify its compliance with the regulations, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and maintaining an adequate quality control program.

624.   The government, in reliance on these false statements by Guaranteed Rate in its certifications to the government, extended FHA insurance coverage to the FHA home loans endorsed by Guaranteed Rate.

625.   The government extended that insurance based on Guaranteed Rate's certification that they are in compliance with all government regulations, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and maintaining an adequate quality control program.

626.   Without Guaranteed Rate's certification, the government would not have allowed Guaranteed Rate to participate in the Direct Endorsement Program, as Guaranteed Rate knew.

627.   As Guaranteed Rate also knew, the government has on numerous occasions commenced enforcement proceedings against mortgagees who fail to comply with the HUD-FHA regulations.

628.   Without Guaranteed Rate's certification, the government would not have extended insurance coverage to files endorsed by Guaranteed Rate, and certainly not at the rates guaranteed by the government.

629.   Without Guaranteed Rate's certification, the government would not have been liable for the insured losses on loans endorsed by Guaranteed Rate and covered by the government.

630.   Had Guaranteed Rate truthfully told the government that Guaranteed Rate was not in compliance with HUD-FHA regulations, and specifically the requirement of not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and maintaining an adequate quality control program., Guaranteed Rate would not have been allowed to endorse any loans for the FHA.

*Loan-level certifications*

631. As set forth above, the purpose of the regulations, and the purpose of Guaranteed Rate's certifications on each endorsed FHA loan files that there was "no defect in connection with [the] approval of this mortgage," and that it had been "approved in accordance with FHA requirements," was to was to ensure that Guaranteed Rate was providing conforming FHA underwriting services to the government.

632. Similarly, the purpose of Guaranteed Rate's certifications on each VA loan that it endorsed that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36" was to ensure that Guaranteed Rate was providing conforming VA underwriting services to the government.

633. A reasonable person would not have extended loan insurance, and certainly not provided it at lower rates offered in the governmental program, if she knew that there were defects in regards to the underwriting process as it relates to the approval of the mortgage, and that the approval had not been in accordance with government requirements, including defects such as improper calculations of borrowers' income related to overtime and bonus earnings to inflate borrowers' incomes; impermissibly calculating borrowers' income using the amounts paid to an employee in a particular month and not borrowers' actual income; improperly calculating the effective income of employees paid on an hourly basis based on a forty hour workweek, when in fact the borrowers were not regularly working at least forty hours in a week; failing to obtain verifications of deposit and bank statements to verify down payments; failing to get donor bank statements used to verify gift funds; failing to properly verify borrowers' down payments; failing to obtain donor bank statements to verify gift fund

assets; deliberately excluding borrower debts discovered in credit reports; and improperly excluding borrowers' contingent liabilities, particularly when Guaranteed Rate was falsely certifying that was not occurring.

634.   Guaranteed Rate knew that the government attached importance to these loan-level certifications that there were no defects in regards to the approval of the mortgage and they had been approved in accordance with government requirements.

635.   Among other things, the government required these certifications before extending insurance coverage to Guaranteed Rate's endorsed loans.

636.   The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and Guaranteed Rate: Guaranteed Rate would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to Guaranteed Rate's loans based on Guaranteed Rate's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; not pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; not allowing mortgage origination employees to manage and control underwriting; not repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and maintaining an adequate quality control program.

637.   Therefore the government was expressly clear that a condition of extending insurance coverage to Guaranteed Rate's endorsed loans and ultimate payment on any losses was that Guaranteed Rate's loan certifications that there were no defects in regards to the

approval of the mortgage and it had been approved in accordance with government requirements, including proper calculations of borrowers' income; obtaining verifications of deposit and bank statements for down payments; obtaining donor bank statements to verify gift funds; and properly determining borrowers' debt obligations.

638.   The government, in reliance on these false statements by Guaranteed Rate in its certifications to the government, extended FHA and VA insurance coverage to the FHA and VA home loans endorsed by Guaranteed Rate.

639.   The government extended that insurance based on Guaranteed Rate's loan-level certification that were no defects in the underwriting process and that the loans had been approved in accordance with government requirements, including proper calculations of borrowers' income; obtaining verifications of deposit and bank statements for down payments; obtaining donor bank statements to verify gift funds; and properly determining borrowers' debt obligations.

640.   Without Guaranteed Rate's loan-level certification, the government would not have extended insurance coverage to files endorsed by Guaranteed Rate, as Guaranteed Rate knew, and certainly not at the rates guaranteed by the government.

641.   Without Guaranteed Rate's loan-level certification, as Guaranteed Rate knew, the government would not have been liable for the insured losses on loans endorsed by Guaranteed Rate and covered by the government.

642.   Had Guaranteed Rate truthfully told the government that there were defects in regards to the approval of the mortgage and it had not been approved in accordance with government requirements, and specifically including the proper calculations of borrowers' income; obtaining verifications of deposit and bank statements for down payments; obtaining

donor bank statements to verify gift funds; and properly determining borrowers' debt obligations, the government would not have insured Guaranteed Rate's endorsed loan files.

643.    In addition, the purpose, as well as the actual outcome, of Guaranteed Rate's underwriting operations was to have Guaranteed Rate's employees endorse loans in which Guaranteed Rate knew the applicant fell below government's requirements for insuring the loans as described in ¶¶ 125-150 and 191-195.

644.    Guaranteed Rate's illegal policies and practices therefore induced material false representations to the government as set forth in ¶¶ 152-182 and 196-204 and Guaranteed Rate is independently liable for such materially false statements knowingly induced these practices.

645.    Additionally, the endorsement of unqualified borrowers also constituted a material false statement on the loan-level certifications.

646.    A reasonable person would not have extended loan insurance on and endorsed loan, and certainly not provided it at lower rates offered in the governmental program, if she knew that the borrower was not qualified for the loan as wrongly certified by Guaranteed Rate.

647.    Guaranteed Rate knew that the government attached importance to these loan-level certifications that the loan files accurately reflected that the borrower was qualified for the mortgage.

648.    Without Guaranteed Rate's certification, the government would not have allowed Guaranteed Rate to participate in the Direct Endorsement Program, as Guaranteed Rate knew.

649.    Among other things, the government required these certifications before extending insurance coverage to Guaranteed Rate's endorsed loans.

650.    The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government Guaranteed Rate: Guaranteed Rate would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to Guaranteed Rate's loans based on Guaranteed Rate's accurate representation that they had followed the regulatory and contractual requirements in endorsing the loans, including not paying commissions to employees performing underwriting functions; pressuring employees to approve ineligible loans; allowing managers to make "exceptions" to government-required conditions on files; allowing mortgage origination employees to manage and control underwriting; repeatedly running the automated underwriting system to "work backwards" to find values that would allow a loan to be approved; and failing to maintain an adequate quality control program.

651.    Therefore the government was expressly clear that a condition of extending insurance coverage to Guaranteed Rate's endorsed loans, and ultimate payment on any claims, was that Guaranteed Rate's loan-level certifications were accurate, and specifically that the applicant was qualified for the loan.

652.    The government, in reliance on these false statements by the Guaranteed Rate in its loan-level certifications to the government, extended government insurance coverage to the government home loans endorsed by Guaranteed Rate.

653.   The government extended that insurance based on Guaranteed Rate's certification that the information provided about the applicant was accurate, and that the applicant met the government's criteria.

654.   Without Guaranteed Rate's loan-level certification, the government would not have extended insurance coverage to files endorsed by Guaranteed Rate, as Guaranteed Rate knew, and certainly not at the rates charged by the government.

655.   Without Guaranteed Rate's loan-level certification, the government would not have been liable for the insured losses on loans endorsed by Guaranteed Rate and covered by the government.

656.   Had Guaranteed Rate truthfully told the government that the information in the file was not accurate, and that the applicant was not qualified, the government would not have insured Guaranteed Rate's endorsed loan files.

### Claims on the government

655.   The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

656.   The Supreme Court has made clear that a request for payment made under a

federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

657.   As set forth above, loans endorsed by Guaranteed Rate caused the government to sustain claims against it.

658.   Had Guaranteed Rate truthfully certified to the government that it was not in conformance with governmental underwriting requirements, the government would not have insured these loans and would not have been liable for claims arising from these improperly approved loans.

659.   Similarly, had Guaranteed Rate not knowingly and falsely certified to the government that there was no defect in connection with the improperly approved mortgage, the government would not have insured any of it loans and would not have been liable for claims arising from these improperly approved loans.

660.   Another independent way in which Guaranteed Rate triggered claims against the government was through the government payments of losses on any of Guaranteed Rate's loans.

661.   Had Guaranteed Rate not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured any of Guaranteed Rate's loans and thus would not have been liable for claims arising from any of Guaranteed Rate's loans.

662.   Another independent way in which Guaranteed Rate triggered claims against the government was through the government subsidized insurance that the government

provided to all of the loans endorsed by Guaranteed Rate, subsidized insurance which constitutes a "claim" under the FCA.

663. Had Guaranteed Rate not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured Guaranteed Rate's loans and thus would have provided the government subsidized insurance to Guaranteed Rate's governmental loans.

664. Similarly, had Guaranteed Rate not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured those loans and would not have been liable for claims arising from these improperly approved loans.

665. Another independent way in which Guaranteed Rate triggered claims against the government was through the lower premium rates charged on Guaranteed Rate's loans.

666. The premium rates charged by the government are premised on mortgagees only endorsing loans that meet governmental requirements.

667. Had Guaranteed Rate not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured Guaranteed Rate's loans at the rates it did.

668. Similarly, had Guaranteed Rate not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured Guaranteed Rate's loans at the rates it did.

669. Thus, Guaranteed Rate triggered a claim against the government by having its loans insured at lower premium rates than was justified.

670. Another independent way in which Guaranteed Rate triggered claims against

the government was through the additional administrative costs to the government on loans that had been endorsed by Guaranteed Rate.

671.   Had Guaranteed Rate not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have borne the additional administrative costs from servicing and supporting Guaranteed Rate's loans.

### FIRST CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(A)
### Causing False Claims

672.   The United States repeats and realleges the allegations above as if fully set forth herein.

673.   The Government seeks relief against Guaranteed Rate under 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

674.   As set forth above, Guaranteed Rate knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its endorsement of government-insured mortgages.

675.   The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by Guaranteed Rate because of Guaranteed Rate's wrongful conduct.

676.   By reason of the false claims of Guaranteed Rate, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

## SECOND CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(B)
### Use of False Statements

677.   The United States repeats and realleges the allegations above as if fully set forth herein.

678.   The Government seeks relief against Guaranteed Rate under 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act.

679.   As set forth above, Guaranteed Rate knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with Guaranteed Rate's endorsement of government-insured mortgages.

680.   The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by Guaranteed Rate because of Guaranteed Rate's wrongful conduct.

681.   By reason of the false claims of Guaranteed Rate, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

## THIRD CAUSE OF ACTION
### 31 U.S.C. § 3729(a)(1)(G)
### Reverse False Claims

682.   United States repeats and realleges the allegations above as if fully set forth herein.

683.   The Government seeks relief against Guaranteed Rate under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

684.   As set forth above, Guaranteed Rate knowingly made, used or caused to be

made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

685.   The Government paid insurance claims, and incurred losses, relating to government-insured mortgages wrongfully endorsed by Guaranteed Rate because of Guaranteed Rate's wrongful conduct.

686.   By virtue of the false records or statements made by Guaranteed Rate, the Government suffered damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by each false statement.

## FOURTH CAUSE OF ACTION
### *Unlawful Retaliation Under the False Claims Act*
### 31 U.S.C. § 3730(h)

687.   Relator realleges the above paragraphs as if fully restated herein.

688.   This is a claim for back pay, interest on the back pay, front pay, compensation for special damages, and such other and further relief as the Court may deem proper for injuries Relator sustained as a result of retaliatory actions taken against Relator by Guaranteed Rate, including litigation costs and reasonable attorneys' fees.

689.   31 U.S.C. § 3730(h) provides, in relevant part:

(h) Relief From Retaliatory Actions.

(1)   . . . Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)   . . . Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but

for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. . . .

690.   Through the acts described above, Relator repeatedly attempted to stop Guaranteed Rate from committing violations of 31 U.S.C. § 3729 *et seq.*

691.   Relator's acts described above, undertaken to stop Guaranteed Rate from committing countless violations of 31 U.S.C. § 3729(a), consisted of protected conduct under 31 U.S.C. § 3729 *et seq.*

692.   Relator repeatedly raised concerns with Guaranteed Rate's management that Guaranteed Rate was engaging in fraud and submitting false claims to the Government.

693.   Guaranteed Rate was aware of Relator's protected conduct and acted in retaliation as a result of Relator's protected conduct under the False Claims Act.

694.   Through the acts described above, Guaranteed Rate repeatedly ignored and/or refused to provide any meaningful response to Relator's lawful inquiries and efforts to redress Guaranteed Rate's intentional and knowing violations of the Government's underwriting requirements and the submission of false claims for mortgage insurance to the Government Programs.

695.   As a direct result of Relator's lawful inquiries and efforts to stop intentional and knowing violations of HUD and the FHA's rules and regulations, Guaranteed Rate unlawfully terminated Relator because of lawful acts done by Relator in furtherance of her efforts to stop Guaranteed Rate from submitting false claims.

696.   Guaranteed Rate is liable under 31 U.S.C. § 3730(h) for (i) an award of double back pay; (ii) interest on back pay; (iii) an award of front pay; (iv) special damages; (v) litigation costs; (vi) attorneys' fees; and (vii) such other and further relief as the Court may

deem proper.

**WHEREFORE, Relator, on behalf of herself and the United States Government,**

**requests the following relief:**

a.  A judgment against Guaranteed Rate in an amount equal to three times the amount of damages the United States has sustained as a result of Guaranteed Rate's violations of the False Claims Act;

b.  A judgment against Guaranteed Rate for civil penalties as described (and adjusted for inflation) under 31 U.S.C. § 3729(a) (1)(G) for each of Guaranteed Rate's violations of the False Claims Act;

c.  That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.  That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.  That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.  That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.  An award to Relator on her retaliation claims including double back pay; interest on back pay; an award of front pay; litigation costs; attorneys' fees; special damages; an injunction restraining further retaliation; reinstatement of Relator's position; reinstate of full fringe benefits and seniority rights; compensation for lost wages, benefits, and seniority rights; and other remuneration.

h.  That a trial by jury be held on all issues so triable;

i.  An award of pre-judgment interest; and

j.  Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: June 14, 2017

THOMAS & SOLOMON LLP

By: _____

J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Jonathan W. Ferris, Esq.
*Attorneys for Relator*
693 East Ave
Rochester, New York 14607
Telephone: (585) 272-0540
